**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **GERIAN STEVEN MOORE and** ) | |
| **GEORGE PROVIDENCE II,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 09 C 701** |
| ) | |
| **DR. WAYNE WATSON, PRESIDENT, and** ) | **Judge Rebecca R. Pallmeyer** |
| **ERMA BROOKS WILLIAMS,** ) | |
| **ASSOCIATE TO PRESIDENT** ) | |
| **FOR COMMUNICATIONS and** ) | |
| **EXTERNAL RELATIONS, in their official** ) | |
| **capacities,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Dr. Gerian Steven Moore is the former faculty advisor to *Tempo*, the student-run

campus newspaper at Chicago State University ("the University"). Plaintiff George Providence II

is the former student editor of that publication. Following a series of controversial stories that

appeared in *Tempo*, University officials removed Moore from his position as faculty advisor and

ultimately terminated him from his post in the University's public relations department. Defendants,

who are officers of the University named in their official capacities,[1] contend that Moore's

termination was performance-related and had nothing to do with *Tempo's* controversial content.

Plaintiffs, however, contend that the University's proffered reason for terminating Moore is

pretextual, and that the firing was an act of retaliation for the student articles.

Plaintiffs further assert that the University's actions disrupted the newspaper's regular

operation and effectively restrained its publication. Following Moore's ouster, Providence clashed

---

[1]        Defendant Dr. Wayne Watson is currently the President of Chicago State, and
Defendant Erma Brooks Williams is the chief public relations officer at the University. Both Dr.
Watson and Ms. Brooks Williams assumed their posts after the relevant events in this case
occurred. They were substituted as Defendants in place of their predecessors, Interim-President
Dr. Frank G. Pogue and Executive Director of University Relations Patricia Arnold.

frequently with University officials and with Moore's replacement as faculty advisor; a main point of contention was Providence's refusal to submit *Tempo*'s editorial content for review prior to publication. Publication of *Tempo* ultimately ceased entirely because, Providence claims, his staff was barred from accessing the newspaper's offices. Providence himself subsequently withdrew from the University, citing harassment by University officials as his reason for departing.

In this lawsuit, Plaintiffs contend that the University's actions violated the First Amendment and the Illinois College Campus Press Act, 110 ILCS 13/1 *et seq.* The parties have filed cross-motions for summary judgment. For the reasons explained below, Plaintiffs' motion is denied and Defendants' motion is denied in part. The case raises a material dispute of fact that requires resolution by the finder of fact at trial.

## BACKGROUND

During the relevant period, *Tempo* was the official student newspaper of Chicago State University, a public state institution located on Chicago's south side. (Def.'s 56.1 Resp. at ¶ 6.) For most of its history, the newspaper had a somewhat uncertain status at the University, publishing only sporadically because of lack of support and limited student interest. In fact, no issues of *Tempo* were published in 2006 or 2007 at all. (*Id.* at ¶ 10.) In 2007, however, the University made a concerted effort to re-establish *Tempo*. (*Id.* at ¶ 16.) In August of that year, then-University President Dr. Elnora Daniel hired Plaintiff Moore to serve as a lecturer and as Daniel's "Special Assistant." (Moore 11/21/2009 Aff. ¶ 9-10.) Moore's prior experience had been as a professor and scholar in the areas of American Culture, African-American Studies, and English.[2] (Moore's CV, Ex. H to Pl.'s Mot.) As part of Moore's duties at Chicago State, he was assigned to oversee the re-establishment of *Tempo* and to serve as the newspaper's faculty advisor once it began publication.

---

[2]  According to Moore's resume, he holds a Ph.D. from "The Program in American Culture" at the University of Michigan. His prior professional experience includes work as a visiting scholar at the University of Michigan and as a Associate Professor at Wittenberg University, Antioch College, and Vassar College, among others.

(Moore 11/21/2009 Aff. ¶ 15.) In January 2008, Moore was given a one-year contract to serve as the University's Director of Communications with the expectation, Moore maintains, that his contract would be renewed thereafter on an annual basis. (Moore 01/07/2010 Aff. at ¶ 17-18.)

In March 2008, the newspaper resumed regular operations, with a staff of student editors and writers, and funded by an "activities fee" paid by the student body. (Moore 11/21/2009 Aff. at ¶ ¶ 6, 8.) Moore described his role at *Tempo* as primarily "advis[ing] [the students] regarding journalistic ethics and procedure . . . not []exercis[ing] any editorial control, as that duty was the sole responsibility of the student editor and staff." (*Id.* at ¶ 17.) To that end, Moore testified, he refrained from reviewing or editing the newspaper's content prior to publication. (*Id.* at ¶ 19; Moore Dep. at 88.) Plaintiff Providence, who, at 48 years of age, was an unconventional college sophomore, became a columnist for *Tempo* in March 2008. (Pl.'s 56.1 Resp. at ¶ 7; Def.'s 56.1 Resp. at ¶ 4.) Providence had previously served as editor of the *Occurrence*, the student newspaper at Oakton Community College, and within a few weeks he was elevated to editor-in-chief at *Tempo*. (*Id.*)

From time to time, Providence and his staff published articles that were critical of the University and its administration. (Moore 11/21/2009 Aff. at ¶ 22.) In one such story, *Tempo* reported that the school's baseball coach had intentionally harmed a player. (Moore Dep. at 138.) In another, *Tempo* quoted the University's Financial Director as making derogatory remarks about the school. (*Id.*) The paper followed those stories with an investigative series looking into the school's failure to provide promised financial aid to some student athletes. (*Id.* at 140.)

According to Moore and Providence, *Tempo*'s muckraking approach soon began generating substantial controversy on campus. Issues of the paper began being stolen from their racks, Moore testified; whole stacks of newspapers would seemingly disappear before students had the opportunity to read them. (Moore Dep. at 139-144.) According to Moore, his association with *Tempo* also began to alter the way he was treated by other faculty members and administrators. (*Id.* at 121-24.) On one occasion, a colleague told Moore that she didn't want to be seen talking

with him. "You're walking around with a target on your back," the colleague purportedly said. "The *Tempo* is exposing all the dirt here."[3] (*Id.* at 122.) Moore said that his immediate supervisor at the time, Dr. Beverly John, was particularly concerned about the negative coverage the University was receiving in *Tempo*'s pages. (*Id.* at 154.) On one occasion, John told Moore: "What y'all are doing is not right," apparently referring to *Tempo*'s content. (*Id.* at 155.) John was also herself quoted in one article, which portrayed the school's Financial Director in a particularly negative light, as saying: "You're writing these articles to make the University look bad, and I will not cooperate with you." (*Id.* at 120.) Following that same article about the Financial Director, then-President Daniel told Moore that she considered it "a shame that that article got out like that." (*Id.* at 121.)

In June 2008, Daniel was forced to resign as University President amid a well-publicized scandal involving the misappropriation of school funds.[4] She was replaced by Interim-President Dr. Frank Pogue. (Def. 56.1 Resp at 8.) At some point following Daniel's departure, Moore was reassigned and placed under the direct supervision of Patricia Arnold, the school's "Executive Director of University Relations." (Moore Dep. at 47-48.) As the court understands Arnold's role, she held a non-academic position that essentially involved managing and overseeing the University's public relations efforts.

In September 2008, Moore established a "staff advisory board" for *Tempo,* which he asked Arnold and another University employee to join. (*Id.* at 77.) Moore conceived of the board, he said,

---

[3]      Moore could not remember exactly which of his colleagues had said these words, but he thought it "might have been Linda." It is unclear to the court whether Linda (her last name is not in the record) or any of the other co-workers who allegedly attempted to warn Moore were deposed in connection with this lawsuit.

[4]      Dr. Daniel's alleged misdeeds garnered significant media attention in both the local and national press. *See, e.g.*, Melissa Isaacson, *Problems and Discontent Bedevil Chicago State,* NEW YORK TIMES/CHICAGO NEWS COOPERATIVE (Nov. 29, 2009) ("Elnora Daniel was forced to resign as the university's president last year after a state audit showed she had expensed a $15,000 Carribean cruise for her family as a 'leadership conference.' Before she left office, Mrs. Daniel also signed off on an $18,000 expense for a tribute book promoting her accomplishments at the university.")

as a way of "protecting" himself from the administration's ire over *Tempo*'s content. (*Id.*) At the time, Moore had learned that *Tempo* was planning to run a series of articles investigating an apparent discrepancy in the funding of a costly University event that had taken place the previous spring. (*Id.* at 77-82.) Moore anticipated that the article would be particularly controversial in light of the recent well-known allegations concerning the misuse of funds at the school. "It was about money," Moore testified, "and money is always an issue at Chicago State." (Moore Dep at 80.) Moore said he was also concerned about rumors "floating around campus" that he had instigated some of *Tempo*'s negative coverage of the University, and he hoped the existence of the board would insulate him from similar criticism over the planned investigative series. (*Id.* at 87-88.)

While Moore had anticipated that the board would oversee the newspaper's business operations only, he testified, Arnold wanted to use the board to engage in pre-publication review of the newspaper's editorial content. (*Id.* at 85-86; 99-100.) According to Moore, Arnold told him that she thought the newspaper was "horrible." (*Id.* at 101.) She "constantly criticized the quality of the writing" in *Tempo*, Moore testified, and she believed that the board should "proofread" the paper before it went to press. (*Id.*) In various conversations, Moore testified, Arnold expressed a desire to review the newspaper's content before publication as well. (Moore Dep. at 135-36.) When Moore told Arnold that he did not believe that the board had a "right to dictate the terms of how or what [the students said,] even if it's grammatically incorrect," Arnold purportedly responded: "Well, you can't just let the students do anything." (*Id.* at 136.) In mid-September, Arnold contacted Providence and offered to "proofread" the newspaper, but Providence declined the offer. In an e-mail dated September 25, 2008, Providence told Arnold that he would consider her comments on *Tempo*'s past issues, but would not submit to any review of future issues before publication. (Providence E-mail, Ex. J to Pl.'s Mot.) "I just think that it is a bad precedent to allow administrators to see a student paper before it goes to press," Providence wrote to Arnold. (*Id.*) Arnold claims that she never insisted on editing *Tempo* and that she never wished to control the content of the

newspaper.  (Arnold Aff. at ¶ 4.)  She also maintains that her primary concern was not the editorial content per se, but the grammatical and journalistic quality of the paper.

On September 29, 2008, Dr. Beverly John sent Arnold a memorandum, ostensibly to provide Arnold with some "insight" into the staff members who had been transferred to her supervision. (Transition Memo, Ex. K to Pl.'s Mot.)  The memo is critical of Moore's credibility and performance, particularly regarding his work with *Tempo*.  Specifically, John accused Moore of "buil[ding] a tenor of dishonesty and deceit" at the University.  (*Id*.)  "I firmly believe that Moore is behind the negative tenor of the student newspaper," John wrote.  (*Id*.)

At about this same time, in late September 2008, Arnold asked Moore to prepare two press releases on behalf of the University.  (Arnold Dep. 120-21.)  Drafting these releases appears to have been a portion of Moore's new duties as a member of Arnold's public relations staff, and did not directly relate to his responsibilities as faculty advisor to *Tempo*.  At the time of the assignment, Arnold testified, her office was very busy and she needed someone on her staff who was capable of writing press releases.  (*Id*. at 121.)  After reviewing the releases, Arnold said, she found the quality of Moore's work to be unsatisfactory.  (*Id*. at 29-30; 121.)  Though Arnold did not specify why she believed Moore's work was deficient, she did testify that, in her view, the releases were not satisfactorily written.  (*Id*. at 121.)  Moore claims that Arnold never explained to him that she needed final drafts for the press releases, so he prepared only rough drafts.  (Moore Dep. at 162.)  He also said that Arnold never reprimanded him nor expressed any dissatisfaction with the quality of his work.  (Moore Aff. 11/21/2009 at ¶ 20.)

On October 6, 2008, Moore stated, Arnold called him into her office to discuss some of the articles that had appeared in a recent issue of *Tempo*.  (*Id*. at 26.)  According to Moore, Arnold questioned the editors' choice of stories, stating: "that's old news, that's not really news, that happened last year; why are they still writing about that?"  (*Id*.)  In addition to these criticisms, Moore said, Arnold also told him that "the paper did not have the right to inquire into the source of

funds for student activities." (*Id.* at 28.)[5]  Arnold denies making any of these statements.  (Arnold Aff. at ¶ 1-2.)  That same day, October 6, Arnold sent an e-mail to Moore and Providence, stating that she believed it was "a conflict of interest" for members of her staff to serve as faculty advisors to *Tempo*.  (E-mail, Ex. M to Pl.'s Mot.)  Arnold wrote that she had reviewed the "College Media Advisor's Code of Ethics" and discovered that "[t]he publicity interests of the university and the news goals of the student media are often incompatible." (*Id.*)  She further stated that she would no longer serve in an advisory capacity to the newspaper and directed that Moore remain interim-advisor only until a suitable replacement could be found.  (*Id.*)  She sent a copy of the e-mail to interim President Pogue.  (*Id.*)

Four days later, on October 10, 2008, Arnold took a step further, sending a letter to Pogue in which she recommended that the University terminate Moore's employment, "effective immediately."  (Letter, Ex. O to Pl.'s Mot.)  Arnold explained that her department "require[d] a public relations professional" and that Moore did not "have the required skill set or experience in the field." (*Id.*)  Arnold testified that she based her stated conclusions about Moore's skill set and experience upon his unsatisfactory performance writing the two press releases.  (Arnold Dep. at 35-37.)  She also testified that she had conferred with her immediate superior, Katey Assem, about the prospect of firing Moore.  (Arnold Dep. at 119.)  Arnold denied that her decision to terminate Moore had anything to do with his role as advisor to *Tempo*.  (*Id.*)  It does not appear that Pogue took any steps to independently review or investigate Arnold's decision.

---

[5]    It is also unclear from Moore's affidavit whether Arnold was specifically talking about the same investigative piece that Moore had anticipated would be controversial.  Though that article is not in the record, the court discerns from the testimony that the controversial story involved a fashion show that had taken place at Chicago State the previous spring.  Apparently, the fashion show had been extremely costly and *Tempo*'s coverage intimated that financial irregularities associated with the event suggested some kind of impropriety.  Arnold testified that she did not "think very highly of [the controversial] article," and she recalled saying as much to Moore.  (Arnold Dep. 112-13.)  She also believes that *Tempo*'s coverage amounted to little more than a series of "personal attacks."  (*Id.* at 113.)

On October 13, 2008, Pogue notified Moore by letter of his termination, effective immediately. (Termination Letter, Ex. P to Pl.'s Mot.) Defendants contend that Moore's immediate termination was necessary because the public relations department had a "limited budget" and Moore was "not an effective employee." (Def's Stat. of Add'l Facts at ¶ 2.) Plaintiffs contest this assertion. Pogue's letter explained that, while Moore would be relieved of his duties at the University immediately, he would continue to receive his full salary until the expiration of his contract on December 31, 2008, but his contract would not be renewed. (Termination Letter, Ex. P to Pl.'s Mot.) The letter also indicated that if Moore had any questions, he should direct them to Arnold. (*Id.*)

Within days of Moore's termination, Providence began clashing with Arnold over the newspaper's access to University staff and what Providence perceived as a general "adversarial posture [by the University] towards the paper." (Providence E-mail, Ex. N to Pl.'s Mot.) Arnold testified that she merely requested that *Tempo* abide by the same protocols that she asked of every other news outlet. Specifically, Arnold asked that *Tempo* and other news outlets contact her office "as a courtesy" before they interviewed University employees. (Arnold Dep. at 48.) Nevertheless, Providence saw this protocol as a provocation and part of a larger attempt by Arnold to control *Tempo*'s coverage of the University. (Providence E-mail, Ex. N to Pl.'s Mot.) In response to Arnold's policy, Providence threatened to file several "open documents requests" as an alternate means of gathering information on the University. (*Id.*)[6] It is unclear whether he ever filed such requests.

On October 30, 2008, Arnold sent *Tempo* a "Letter to the Editor," signed by a number of high-level University administrators. Though it is unclear whether the letter ultimately ran in print,

_____

[6]        The court assumes Providence was referring to requests filed under Illinois's Freedom of Information Act, 5 ILCS 140/1, which requires that records maintained by state public institutions be open to the public for inspection.

the parties do not dispute its authenticity.  It says, in part:

> In recent issues, you have lobbed anti-Semitic, homophobic, and mean-spirited personal attacks that demonstrate that you are out of step with the expectations of the CSU family.

> The First Amendment grants Tempo the right to force literate members of this community to suffer the humiliation of its poor news judgment, grammar, spelling, punctuation, syntax, layout and other *faux pas* that reflect poorly on the quality of teaching and learning at this institution of higher education.  We do not wish to deny you that right—or the right to treat others in ways that you would not want to be treated.

> However, [the school's leadership] is committed to fostering civility, respect, fair play, and collegiality.  Therefore, we request that you not represent us in print as promoting behavior or values that fall far short of those high standards. [7]

(Ex. T to Pl.'s Mot.)  Throughout the subsequent months of November and December, Providence and Arnold continued to exchange testy e-mails, which Plaintiffs believe demonstrate Arnold's antagonistic attitude toward the newspaper and toward Providence.  (*Id.*)

Arnold apparently took particular offense at a story questioning the propriety of the school's decision to invite Arnold's daughter, evidently a recording artist, to perform at a University event.[8]  On December 11, 2008, Arnold wrote another "Letter to the Editor" addressing the story: "A credible journalist doesn't ask insinuating questions; he tries to find answers, if improprieties are suspected, "Arnold wrote.  "[Y]ou're sweating the small stuff—or making it up as you go along, whichever is more convenient.  How sad for all of us."  (E-Mail, Ex. EE to Pl.'s 56.1 Resp.)  Again, it is unclear whether *Tempo* published the letter, but Providence did respond in an e-mail, telling Arnold that the questions raised in the article actually "originate[d] from a few of [Arnold's] peers."  (*Id.*)  In an e-

---

[7]  Disappointingly, neither party has seen fit to actually place back copies of *Tempo* into the record for this court's review.  As a result, the court is unable to determine at this time whether *Tempo* did indeed contain poor grammar, spelling, or punctuation.  Nor is the court able to judge whether Ms. Arnold's description of the newspaper as anti-Semitic and homophobic is accurate.

[8]  Again, the parties have not entered the relevant article into the record.  Instead, the court discerns this information from the correspondence exchanged by Arnold and Providence.

mail response copied to Dr. Pogue, Arnold wrote:

> Thank you, however, you use the term "peers" quite loosely. . . . Not one of my peers–administrators of this university–was involved in this mean-spirited, irresponsible and infantile mud-slinging . . . .
>
> You and your interim advisor are wholly liable for not verifying facts before implying in print that I have committed ethics violations . . . .
>
> This is a very serious charge that you made. It could have seriously harmed me personally and professionally. I am sure the intent was to put me in the hot seat. Unfortunately for you and the cabal, Dr. Pogue and [another University administrator approved of Arnold's daughter's performance.] . . .
>
> I'm sure you don't advise your children or grandchildren to be dishonest, destructive, unprofessional, vindictive and mean-spirited. You don't have to: they learn from your behavior. This is a reap-what-you-sow world; you'll get an opportunity to learn from your behavior. . . .

(*Id.*) It is unclear from the context of the e-mail itself whether Arnold's references to *Tempo*'s "interim advisor" and "the cabal" were in fact references to Moore or to Marvey Jackson, Chicago-State's Executive Director of Student Activities, who succeeded Moore as the newspaper's interim faculty advisor in October 2008.

With Moore's termination, *Tempo* had temporarily lost its faculty advisor. According to Jackson, student organizations are not allowed to function without a faculty advisor. (Jackson Aff. ¶ 3.) So, when Moore was fired, Marvey Jackson stepped in as interim-advisor ostensibly to permit *Tempo*'s activities to continue uninterrupted. (*Id.*) Jackson served as advisor to the newspaper from mid-October 2008 until February 2009. (*Id.* at ¶ 4.) The parties agree that Jackson took a laissez-faire attitude toward the newspaper. Jackson's noninterference notwithstanding, Providence stated, the publication of *Tempo* was indeed interrupted in January 2009 when student-activity funds necessary for the newspaper's operation suddenly became "unavailable." (Providence 10/23/09 Aff. at ¶ 13.) What caused these funds to be unavailable is unclear.

In February 2009, at Providence's request, Professor Quraysh Lansana became the permanent faculty advisor to *Tempo*. (*Id.* at ¶ 15.) Lansana, an Assistant Professor in the English

Department, had previously complimented Providence's work at the newspaper and offered to help. (Providence 10/23/09 Aff. at ¶ 1.) One of the conditions that Lansana placed upon his assistance, however, was that the newspaper work to alter its content. "These young people need to understand the difference between investigative journalism and a witch hunt," Lansana wrote to Dr. Howard Johnson, the University's Interim Vice President for Student Affairs. (Lansana Memo, Ex. S to Pl.'s Mot.) "[T]he newspaper can and should function as an integral part of the public relations mission, defined in the broader sense, of the university. It can and should ask hard questions of administrators, faculty and students. [But] Tempo should also celebrate CSU by reporting on events and people that make this place work." (*Id.*) In his testimony, Lansana expounded on this idea, explaining that he believed the newspaper's coverage needed to focus more on the "triumphs and successes" of the University. (Lansana Dep. at 25.) According to Providence, Lansana also insisted upon reviewing all of Tempo's stories before they went to print. (Providence 10/23/09 Aff. at ¶ 16.)

Providence stated that he presented Lansana with a list of prospective articles for a new issue of *Tempo* on February 17, 2009. (*Id.* at ¶ 17.) Later that day, Lansana informed Providence that he did not believe the proposed issue had enough "original content," so he decided "there would be no paper published this week." (*Id.* at ¶ 18; Lansana Dep. at 22.) The paper was not printed as scheduled, and a subsequent issue of *Tempo* was not published until April 16, 2009. (Providence 10/23/09 Aff. at ¶ 21-23.) In his testimony, Lansana admitted that he unilaterally decided to delay the publication of the issue, over Providence's objection. (Lansana Dep. at 21-23.)

Providence published the next two issues of *Tempo* without Lansana's prior approval, despite Lansana's repeated requests to review the content in advance. (Providence 10/23/09 Aff. at ¶ 22-25.) On April 23, 2009, Lansana resigned as *Tempo*'s faculty advisor. In a letter to Johnson, Lansana cited, as his reason for leaving, his inability to control Providence or to "work

with" *Tempo*'s content:

> When I agreed to return to the post, we spoke earnestly about my desire to work with the editorial direction and content. . . . The current student editor, George Providence II, has consistently failed to provide requested information, return phone calls in a timely fashion, and made the decision to produce a paper before I had the opportunity to proofread the content. . . . Mr. Providence, in short, has operated at his own discretion. What rules are there to hold him accountable for his insubordination?

(Ex. X to Pl.'s Mot.)

According to Providence, no issues of *Tempo* were ever published again after April 28, 2009, because the newspaper staff could not obtain access to its offices. (Providence 10/23/09 Aff. at ¶ 31.) University officials typically maintain the keys and control access to all campus activity offices, including those for the newspaper. (Jackson Aff. at ¶ 6.) Providence claims that the University's action to bar *Tempo*'s staff from its offices has "prevented the publication of *many issues of Tempo.*" (Providence 10/23/09 Aff. at ¶5.) (emphasis in original). In the autumn of 2009, Providence resigned as *Tempo*'s editor and opted not to return as a student to Chicago State. He contends that he left the school "because of the emotional toll the harassment by CSU officials was having on [him]," but reports that he would like to resume his studies and his role as editor "if [he] can be free of harassment, roadblocks, and restraint." (Providence 01/07/2010 Aff. at ¶ 3-5.)

Plaintiffs contend that the sole inference to be drawn from these facts is that the University's administration deliberately acted to restrain *Tempo*'s publication in violation of the First Amendment and Illinois state law. Defendants deny that the University engaged in any such effort to censor or restrain *Tempo,* and offer explanations for the University's actions that are unrelated to speech. Both parties seek summary judgment on all claims.

<b><u>DISCUSSION</u></b>

**I.    Summary Judgment Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When presented with cross-motions for summary judgment, the court is required to adopt a "Janus-like perspective," viewing the facts for purposes of each motion through the lens most favorable to the non-moving party. *See Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill.1992), *aff'd* 9 F.3d 1198 (7th Cir.1993). The court thus "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir.2005) (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir.2001)).

## II.    Providence's Standing and Mootness

Plaintiffs contend that the University violated the First Amendment by terminating Moore, interfering with *Tempo's* content, and forcing *Tempo* to cease publication. Although the complaint does not specifically allege a claim under the Illinois College Campus Press Act, 110 ILCS 13/1 *et seq.*, Plaintiffs do invoke that Act, which the court deems relevant to their assertion that *Tempo* is a public forum for First Amendment purposes. Before the court considers the merits of the First Amendment claim, it pauses to address briefly the question of whether Plaintiffs are the proper persons to bring this lawsuit. Defendants do not dispute Moore's standing,[9] but they do contend that Providence lacks standing to bring a claim and that any right to relief he may have had has been mooted by his withdrawal from the University. (Def. Br. at 5-6.)

An Article III federal court cannot decide a question that will not affect the rights of the litigants before it. *See Central Soya Co. v. Consolidated Rail Corp.*, 614 F.2d 684, 686-87 (7th Cir. 1980) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)). Rather, the judicial power of the federal courts extends only to matters which are present "cases" or "controversies" in the

---

[9]    The College Campus Press Act specifically recognizes standing in a "collegiate media advisor" who claims he suffered retaliation for "refusing to suppress protected free expression rights of collegiate student journalists and of collegiate student editors." 110 ILCS 13/20. The court is uncertain why Plaintiffs have not specifically sought relief under state law pursuant to this Act.

constitutional sense. *Id.* at 687. To meet the present case or controversy requirement, a litigant "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Schmidling v. City of Chicago*, 1 F.3d 494, 498 (7th Cir. 1993) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)).

Providence has satisfied this requirement. As the paper's editor-in-chief, Providence was engaged in constitutionally-protected expression. The record demonstrates that Providence was the driving force behind *Tempo*'s editorial content and publication, and he personally bore the brunt of the criticism the newspaper's controversial coverage engendered. Providence alleges that the University's disruption of *Tempo* deprived him of his chosen forum for expression. This is an actual injury that is contemplated by the First Amendment, and one for which Providence has standing to sue.

Providence must also "satisfy the 'causation' and 'redressability' prongs of the Art. III minima by showing that the injury 'fairly can be traced to the challenged action,' and 'is likely to be redressed by a favorable decision.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The causation requirement poses no problem here. Providence's claim, as the court understands it, is that his injury is the direct result of the University's deliberate interference with his controversial newspaper. Nor is such an injury beyond the power of this court to provide redress. Though Providence did not attend Chicago State University in the past academic semester, he claims that he would like to resume both his studies and his participation in the school's student newspaper. On summary judgment, the court takes Providence at his word. Assuming that Providence is qualified to re-enroll at Chicago State–and the court has no reason to believe that he is not–the redress Providence seeks would serve to protect his right to participate in the publication of the school's student newspaper without restraint or interference by the University.[10] Such relief is within

---

[10]    It appears that *Tempo* has now been replaced by a successor student publication, (continued...)

the equitable power of this court to grant. Providence's claims are not moot.

In reaching this conclusion, the court is mindful of the holding in *Board of School Commissioners of City of Indianapolis v. Jacobs*, 420 U.S. 128 (1975). That case involved a group of high-school students who claimed that the local school board had unconstitutionally blocked the publication of their student newspaper. *Id.* at 129. The students prevailed before the appellate court, but graduated before the Supreme Court could hear the case. In a *per curiam* decision, the Court dismissed the students' claims as moot. *Id.*

The *Jacobs* case is distinguishable from this one because Providence has not graduated.[11] Because he has asserted his interest in being reinstated as a Chicago State student, the court is reluctant to conclude that this student journalist lacks standing to challenge "the precise sort of chilling effect which has long been a central concern" of the First Amendment. *Id.* at 852 (Douglas, J., dissenting); *see also Zykan v. Warsaw Community School Group Corp.*, 631 F.2d 1300, 1304 (7th Cir. 1980) (students' First Amendment claims were not moot where school administrators' actions were "said to have had a chilling effect on academic freedom and to have caused harm to one plaintiff and to be causing harm to another.")[12] Providence contends that his resignation from

---

[10](...continued)
*The Cougar Chronicle.* That newspaper bills itself as "an independent student newspaper" published by "the Independent Student Press Association of Chicago State University." *See* www.cougarchronicle.net (last visited Sept. 7, 2010).

[11] Many courts have held that the constitutional claims of students against school administrators become moot once the students graduate. *See, e.g., Lane v. Simon*, 495 F.3d 1182, 1186 (10th Cir. 2007) ("We have previously held that when an individual graduates from school there no longer exists a live controversy necessary to support an action to participate in interscholastic activity.") (internal quotation marks omitted). Courts invoke such a rule because graduation renders a school administrator powerless to affect the rights of a student plaintiff. *See Corder v. Lewis Palmer School Dist. No. 38*, 566 F.3d 1129, 1225 (10th Cir. 2009). In this case, however, Providence purports to be eligible to return to the University; the court concludes, at this stage, that school administrators potentially retain their power to have an impact on his rights.

[12] Defendants cite *Zykan* for the position that a student is not entitled to have the teacher or faculty advisor of her choice. In *Zykan*, the Seventh Circuit found that claims based
(continued...)

15

*Tempo* and his withdrawal from the University were indeed caused by circumstances beyond his control. He claims that Defendants' unconstitutional conduct and harassment forced him to abandon his journalistic and scholarly pursuits. Courts have long recognized that a case does not become moot simply because the litigant has "abandoned [his] efforts as a result of the very harassment" he sought to restrain by filing suit. *Allee v. Medrano*, 416 U.S. 802, 810 (1974).

Providence has adequately alleged a constitutional injury that, he claims, is occasioned by Defendants' unlawful conduct, and for which this court has the means and power to fashion redress. The court concludes that his claims are not moot and that he retains standing to pursue this case.

## III.    First Amendment Right of the Student Press

Next, the court must consider the contours of the constitutional protection afforded to publications like *Tempo*. "The First Amendment guarantees wide freedom in matters of adult public discourse." *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Applying this principle, most courts have "recognized that student media outlets at public universities, and the student journalists who produce those outlets, are entitled to strong First Amendment protection." *Husain v. Springer*, 494 F.3d 108, 121 (2nd Cir. 2007); *see also Joyner v. Whiting*, 477 F.2d 456, 460 (4th Cir. 1973) ("It may well be that a college need not establish a campus newspaper, or, if a paper has been established, the college may permanently discontinue publication for reasons wholly unrelated to the First Amendment. But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment."); *Stanley v. Magrath*,

---

[12](...continued)
exclusively on a school's employment decisions were "properly litigated not by the students, whose injury is highly attenuated, but by the teachers who have suffered the harm." 631 F.2d at 1307. As the court understands Providence's claim, however, it is not based on Moore's termination; Moore himself challenges that decision. Providence's claim is based on the school's alleged restraint of his own protected speech. Such a harm cannot be characterized as "highly attenuated."

16

719 F.2d 279, 282 (8th Cir.1983) ("[a] public university may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper.")

In *Hosty v. Carter*, however, the Seventh Circuit took a somewhat narrower view of the protections afforded to student publications at public universities. 412 F.3d 731 (2005) (*en banc*). Specifically, *Hosty* held that the same standard that governs censorship of student speech in primary and secondary schools also applies to speech in colleges and universities. *Id.* at 735. That standard permits a school to regulate "the speech for which it also pays" when its "actions are reasonably related to legitimate pedagogical concerns." *Id.* at 734 (quoting *Hazelwood School District v. Kulmeier*, 484 U.S. 260, 273 (1988)). Applying the *Hazelwood* standard in *Hosty*, the Seventh Circuit questioned whether the college newspaper at issue was a protected public forum and implied that the university could "refuse to disseminate" some of the potentially sensitive speech found therein. *Id.*

Largely in response to the *Hosty* decision, the Illinois state legislature passed the Illinois College Campus Press Act, 110 ILCS 13/1 *et seq,* which went into effect on January 1, 2008.[13] That statute designates that "[a]ll campus media produced primarily by students at a State-sponsored institution of higher learning is a public forum for expression by the student journalists and editors at the particular institution." 110 ILCS 13/10. Such media outlets, the Act states, are not to be subject to prior review by university officials, regardless of whether the outlets receive financial support from the university. *Id.* Under the Act, faculty advisors may teach student journalists "professional standards of grammar and journalism," but the students themselves are

---

[13] *See* Nicole Casarez, *The Student Press, The Public Workspace, and Expanding Notions of Government Speech*, 35 J. C. & U. L. 1, 38-39 (2008) ("Both the Oregon and the Illinois state legislatures also responded to *Hosty* by increasing state law protections for student publications. . . . However, states with student press rights laws are clearly the exception, not the rule.")

to be solely "responsible for determining the news, opinions, feature content, and advertising content of campus media." 110 ILCS 13/15. By the same token, the Act prohibits any retaliatory act against a faculty advisor who refuses to "suppress [the] protected free expression rights of collegiate student journalists." *Id.*

By intentionally opening campus newspapers as a space for public discourse and by explicitly declaring such a publication as a "public forum for expression," the Illinois legislature purposefully created a "designated public forum" for student speech. *See Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008) ("Government creates a 'designated public forum' when it 'intentionally open[s] a nontraditional forum for public discourse.'") (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)); *see also Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 677 (1998) ("Designated public fora . . . are created by purposeful governmental action.")[14] As such, subsequent governmental efforts to restrict student speech in Illinois's campus newspapers are subject to strict constitutional scrutiny. *Christian Legal Society v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006); *Forbes*, 523 U.S. at 677 ("If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny.").

In light of the *Hosty* decision, the Illinois legislature's intent to designate student publications as public forums that are free from censorship is particularly clear. As the majority in *Hosty* itself observed, "public officials may not censor speech in a designated public forum." 412 F.3d at 738; *see also Rosenberger v. Univ. of Virginia*, 515 U.S., 819, 829 (1995) (the state may not "exercis[e] viewpoint discrimination, even when the limited public forum is one of its own creation.") In short,

_____

[14]    The Illinois College Campus Press Act is not unique in creating a designated public forum by operation of state law. Other examples of similarly designated public forums include "state university meeting facilities expressly made available for use by students, . . . school board meetings open to the public by state statute, . . . advertising space in state-owned subway and commuter rail stations, . . . [and] a city owned and operated senior center sponsoring lectures." *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999) (collecting cases).

by adopting the Illinois College Campus Press Act, the state voluntarily ceded any ability it may have had to control the content of a student publication such as *Tempo*. As a result, the First Amendment prohibits University officials from taking any "adverse action against [*Tempo* or its staff], including engaging in conduct designed to chill the speech contained in future editions, on the basis of the views expressed in the publication unless such action served a compelling government interest." *Husain*, 494 F.3d at 125. Strict constitutional scrutiny, therefore, applies to any effort by the University to restrict student speech *in Tempo*'s pages. *Forbes*, 523 U.S. at 677.

## IV.    The University's Conduct Toward Moore

The parties do not dispute that Plaintiff Moore suffered an adverse action. He was removed from his professional duties and his employment was terminated. A material dispute of fact remains, however, as to whether Moore's termination was occasioned by his refusal to suppress student expression in *Tempo* or by his unsatisfactory job performance in unrelated tasks. The resolution of this dispute requires the weighing of evidence and credibility judgments which are the appropriate province of the trier of fact. Arnold testified that she decided to terminate Moore solely because of his performance on two press releases assigned to him in late September 2008. Plaintiffs, however, have produced sufficient evidence to allow the finder of fact to reasonable determine that this explanation is pretextual. "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 479 (7th Cir. 2010) (quoting *Bodenstab v. Cook County*, 569 F.3d 651, 657 (7th Cir. 2009)).

In assessing this issue, the court notes, first, that Arnold held strong views about *Tempo*'s editorial content. Both before and after Moore's ouster, Arnold expressed her displeasure with *Tempo*'s coverage–often in harsh terms. Nor were her complaints limited to matters of grammar or professionalism. Rather, the record reflects that Arnold protested about the newspaper's story choices and methods of reporting. Despite Arnold's complaints, Moore testified, he refused to

interfere with or suppress the speech published in *Tempo*.[15]  A reasonable jury might infer that Arnold's distaste for *Tempo*'s controversial content was the motivating factor behind her decision to terminate Moore.[16]

Dr. Beverly John's memorandum to Arnold, dated September 29, 2008, blamed Moore for what John called the "negative tenor of the student newspaper."  On October 6, 2008, Moore claims, Arnold attempted to persuade him to alter *Tempo*'s editorial content, but Moore refused.  Later that same day, Arnold announced that it was a conflict of interest for Moore to advise *Tempo* and instructed him to find a replacement.  Four days after that, on October 10, Arnold wrote to Pogue urging Moore's termination from the university.  The time lapse between Moore's statutorily-protected conduct–his refusal to suppress student speech–and the adverse employment action is short enough to raise suspicions.  *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000) ("In considering whether the timing of an adverse employment action gives rise to an inference of discrimination, the critical inquiry is . . . the time lapse between the adverse action and the *protected expression*.")

Arnold's actions after Moore's termination raise further questions concerning her motives. Within days of firing Moore, and for at least two months thereafter, Arnold regularly engaged in heated e-mail correspondence with Providence over *Tempo*'s content.  Some of Arnold's complaints involved articles that she felt portrayed her personally in a false light.  Arnold's own e-

---

[15]     Defendants contend that Moore cannot make out a claim for retaliation because he was not the faculty advisor at the time that he was fired from the University. (Pl.'s Br. at 10.)  The court notes, however, that a fair reading of the record suggests that Moore was indeed interim-advisor at the time that he was terminated.  In any event, a retaliatory action need not be aimed at influencing future conduct; rather, it may be intended to punish past conduct.

[16]     Though Dr. Pogue was the ultimate decision maker, there is evidence that Moore was terminated based on Arnold's recommendation without any independent review or investigation by Pogue.  In such a situation, Arnold may be characterized as the "cat's paw" whose alleged improper motive would be attributable to the decision maker.  *See, e.g., Martino v. MCI Communications Servs., Inc.*, 574 F.3d 477, 452-53 (7th Cir. 2009).

mails reflect that she considered *Tempo*'s "interim advisor," possibly referring to Moore, to be "wholly liable" for the paper's objectionable content.

Though she disputes making some of the statements Plaintiffs attribute to her, Arnold admits that she discussed *Tempo*'s content with Moore on various occasions before his firing. In contrast, Moore testified, Arnold never once mentioned Moore's supposedly dissatisfactory work performance. Given these circumstances, a reasonable finder of fact might determine that Arnold's proffered reason for firing Moore is mere pretext and that her true motivation was Moore's refusal to curtail *Tempo*'s constitutionally-protected speech. Likewise, a reasonable finder of fact might elect to believe Arnold's testimony. Because resolving this material dispute calls for credibility determinations, the court concludes that neither party is entitled to summary judgment on this issue.

## V.    The University's Conduct Toward Providence and *Tempo*

Likewise, there are unresolved questions of fact with respect to the University's alleged interference with *Tempo* and Providence's protected speech. It is undisputed that throughout Providence's tenure at the newspaper, various university administrators voiced their strong distaste for *Tempo*. Such expressions of disagreement are themselves constitutionally-protected speech, but they are also circumstantial evidence that might reasonably lead a finder of fact to infer that the University's actions with respect to *Tempo* were motivated by a desire to suppress its unfavorable coverage. Viewing the entire record, a reasonable finder of fact could conclude either that the University's actions were innocuous administrative machinations, as Defendants claim, or that they constituted prohibited viewpoint discrimination, as Plaintiffs contend. Summary judgment for either party is therefore inappropriate; the facts require further development at trial.

Providence claims that various obstacles interfered with the regular publication of *Tempo*. The University's financial support for *Tempo* was inconstant, and publication occasionally stalled due to irregular funding. In addition, after Moore's departure, *Tempo* had a series of advisors who

were less protective of the newspaper's independence than Moore had been. Jackson was essentially an absentee caretaker, and Lansana insisted on personally reviewing the newspaper's content prior to publication. Indeed, Lansana admitted to delaying the newspaper's publication on at least one occasion when he found the paper's content to be unsatisfactory. Lansana's letters to University administrators also reveal his intention to influence the newspaper's coverage of the University, resulting in more positive press, and show that he ultimately envisioned *Tempo* to be an "integral part of the [University's] public relations mission." When Providence bristled at this change of tone and mission–as any independent-minded student journalist might–Lansana resigned and complained to University administrators about Providence's "insubordination." In the months that followed, Providence claims, his staff was locked out of *Tempo*'s offices and precluded from publishing. *Tempo* fell into decrepitude and its days as campus gadfly ended.

Defendants contend that these events are "random and inconsequential acts and occurrences" that are merely reflective of the University's ordinary administration of any student group. (Def.'s Br. at 10.) They frame Arnold's interactions with Providence as simply an experienced communications professional's offering assistance to a student who had demonstrated dubious writing skills. When Moore was terminated from his job for unrelated performance reasons, Defendants claim, the University readily assigned others to fill Moore's role as faculty advisor. They point out that Providence himself recommended Lansana as his preferred choice for faculty advisor. While there may have been random delays in *Tempo*'s receipt of funds, Defendants urge, the University always saw to it the monies were eventually received. While Providence complains of restrictions placed on his access to *Tempo*'s offices, Defendants maintain that the school's policies required that it not give students the keys to school facilities. They claim the University administered access to *Tempo*'s offices in a manner consistent with these policies.[17] In sum,

---

[17] The University's policy against giving facility keys to students may well serve the
(continued...)

Defendants contend that none of the events Plaintiffs complain of were attempts to control or restrain *Tempo*'s content.

Resolving the conflicting factual narratives presented by the parties will require the weighing of evidence at trial. As it stands, a reasonable finder of fact could, but need not necessarily, conclude that University officials acted deliberately to alter or eliminate disfavored student speech from the protected forum of the campus newspaper.

## VI.    Availability of Damages

Lastly, Defendants contend that the Eleventh Amendment grants them immunity from suit for all of Plaintiffs' claimed damages. Defendants are being sued in their official capacity only, and the Supreme Court has observed that such suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, FN 55 (1978)). That appears to be the case here, where Plaintiffs' claims arise wholly out of the official acts of the University as an arm of state government. "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166.

In an effort to accord states "the dignity that is consistent with their status as sovereign entities," the Eleventh Amendment operates to "shield[] state treasuries" from suit arising under federal law. *Federal Maritime Comm'n v. South Carolina State Ports Authority*, 535 U.S. 743, 760-67 (2002). There are three principal exceptions to the Eleventh Amendment's bar on suits against state actors in federal court. *See MCI Telecommunications Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323, 337 (7th Cir.2000). First, the state may waive its immunity by consenting to be sued.

---

[17](...continued)
school's legitimate security interests. Defendants have not explained, however, why such a policy would explain or justify the complete exclusion of *Tempo*'s staff from its offices for a prolonged period of time.

Second, Congress may abrogate the state's immunity through a valid exercise of its constitutionally-authorized powers. And, third, under *Ex Parte Young*, 209 U.S. 123, 159 (1908), a plaintiff may file "suit[ ] against state officials seeking prospective equitable relief for ongoing violations of federal law. . . ." *See Indiana Protection Agency and Advocacy Services v. Indiana Family and Social Services Administration*, 605 F.3d 365, 371 (7th Cir. 2010) (collecting cases) (en banc).

Plaintiffs purport to rely on the first exception–consent–and assert that the Illinois College Campus Press Act serves as the necessary waiver of state immunity in this action. The argument is an awkward one in this context, where Plaintiffs are pursuing a claim under the First Amendment rather than the Act itself. Assuming–as the parties appear to do–that the College Campus Press Act governs the scope of any immunity waiver for a First Amendment claim, the court concludes that the state has not waived immunity for purposes of a damages award. Specifically, the statute provides that student journalists and faculty advisors "may commence a civil action to obtain appropriate injunctive and declaratory relief as determined by a court" for violations of the Act. 110 ILCS 13/20. It also grants to the courts discretion to award attorney's fees to any prevailing party in such an action. *Id.* ("Upon motion, a court may award attorney's fees to a prevailing party in a civil action brought under this Section.") As the court reads the provision, it does indeed serve to waive the state's immunity from suit.[18] This waiver, however, explicitly extends only to certain forms of relief, namely "injunctive and declaratory relief" and, possibly, attorney's fees. Courts should not take it upon themselves to extend the waiver of sovereign immunity beyond that which the legislature has explicitly intended. *See Smith v. United States*, 507 U.S. 197, 203 (1993). The

---

[18] Though the parties do not argue the point, the court is also satisfied that the waiver set forth in 110 ILCS 13/20 extends to lawsuits in federal courts as well as state forms. *See Turin v. Koropchak*, 567 F.3d 880, 883, n. 4 (7th Cir. 2009) ("There is of course a distinction between a state's immunity from suit in federal court (flowing from the 11th Amendment) and its immunity from liability in all fora (which predates the 11th Amendment and exists by virtue of a state's status as a sovereign entity).") The Illinois statute explicitly refers to a federal constitutional right by invoking the public forum analysis under the First Amendment. The statute also refers to "relief as determined by a court," making no distinction between the state and federal judiciary.

Illinois Campus Press Act's explicit mention of injunctive and declaratory relief, and its exclusion of any similar reference to monetary damages, expresses a limited waiver of immunity against claims for equitable relief only. While this limited waiver permits Plaintiffs to maintain suit for declaratory and injunctive relief–and perhaps attorney's fees in the event that they prevail–it does not extend to Plaintiff's claims for monetary damages. Defendant's motion for summary judgment is therefore granted in part. Plaintiffs are barred from recovery of monetary damages against university officials in their official capacity.

**CONCLUSION**

Defendants' motion for summary judgment [35] is granted in part and denied in part. Plaintiffs may not recover monetary damages in this action. Plaintiffs' motion for summary judgment [38] is denied.

ENTER:

Dated: September 7, 2010

_____

REBECCA R. PALLMEYER
United States District Judge