**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GERIAN STEVEN MOORE, and** ) | |
| **GEORGE PROVIDENCE II,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **No. 09 C 0701** |
| **v.** ) | |
| ) | **Hon. Rebecca R. Pallmeyer** |
| **WAYNE WATSON, President of Chicago** ) | |
| **State University, and ERMA BROOKS** ) | |
| **WILLIAMS, Associate to President for** ) | |
| **Communications and External Relations,** ) | |
| **in their official capacities** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPNION AND ORDER**</u>

This suit was brought to challenge the alleged efforts of administrators at Chicago State University to control the content of *Tempo*, the University's student newspaper. Plaintiffs are George Providence II, the former student editor of the newspaper, and Dr. Gerian Steven Moore, who acted as faculty advisor for the paper until October 2008, when he was terminated from his position in the University's public relations office. Providence and Moore claim that the University terminated Moore in retaliation for a series of news stories critical of University administration and then took action to undermine the newspaper's publication and cause its ultimate demise. Specifically, Plaintiffs allege that officials required Providence to submit newspaper copy for pre-publication review, delayed the paper's publication, imposed restrictions on interviews with University staff, withdrew funding for the paper, and locked Providence out of the newspaper office. Publication of *Tempo* ended after Spring 2009, when Providence withdrew from the University. In this lawsuit, tried to the bench in April 2011, Plaintiffs assert claims under the First Amendment and

the Illinois College Campus Press Act, 110 ILCS 13/1 *et seq.*,[1] against Defendants, administrators

of the University named in their official capacities, seeking declaratory and injunctive relief.[2]

As explained below, the court concludes that Plaintiffs have proven their case in part and

grants limited relief.  The court directs that Plaintiff Moore be reinstated and that Defendants purge

any negative references in his personnel records.  Plaintiffs' request for additional declaratory and

equitable relief is denied.

## FACTUAL FINDINGS[3]

### I.      Parties

Plaintiff Gerian Steven Moore is a former employee of Chicago State University ("the

University" or "CSU"), a state educational institution located on Chicago's south side.  (UF ¶ 4.)

Moore earned his Ph.D. in American Culture at the University of Michigan and had taught at several

---

[1]      In its opinion on summary judgment, the court suggested that Plaintiffs have not sought relief under the state law itself.  *See Moore v. Watson*, 738 F. Supp. 2d 817, 827 n.9, 834 (N.D. Ill. 2010).  The parties have made no further mention of this issue, but the court recognizes this was not accurate.  Though Plaintiffs did not specifically allege violations of the Illinois statute in the prayer for relief at the end of their complaint, they did invoke the statute at the outset, alleging that relief was "also sought under the Illinois College Campus Press Act."  (Pls.' Compl. ¶ 1.)  The court reads Plaintiffs' complaint liberally.  As the Seventh Circuit has explained, even after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "plaintiffs in federal courts are not required to plead legal theories."  *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010).  Moreover, both sides have assumed throughout this litigation that Plaintiffs raise claims under both the First Amendment and Illinois law.

[2]      On September 7, 2010, this court issued an order granting Defendants' motion for summary judgment on Plaintiff Moore's monetary damages claim for backpay.  The court ruled that the College Campus Press Act, 110 ILCS 13/20, did not waive the state's immunity from suits for monetary damage.  *Moore*, 738 F. Supp. 2d at 834-35.  Furthermore, the claim for backpay was inappropriate against Defendants, sued in their official capacity, under federal law.  *See Omosegbon v. Wells*, 335 F.3d 668, 672-73 (7th Cir. 2003) (holding that a terminated professor could not bring a claim for backpay under 42 U.S.C. § 1983 for First Amendment violations against defendants, officials of Indiana State University, in their official capacities).

[3]      The court presents findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a).  Except where noted otherwise, facts are drawn from the pretrial order and from evidence presented at trial.  The parties' Statement of Uncontested Facts, Schedule A to Final Pretrial Order, is cited here as "UF ¶ ___."  The court cites the trial transcript as "Trial Tr. at ___."  The parties' trial exhibits are cited as "Pls.' Ex. ___" and "Defs.' Ex. ___."

other colleges before coming to CSU. (Moore CV, Pls.' Ex. 1.) Then-CSU President Dr. Elnora Daniel hired Moore as a lecturer in the Department of African American Studies for the Fall 2007 semester. (Letter from Daniel to Moore of 5/31/2007, Pls.' Ex. 2.) Due to low registration, however, the University canceled the class Moore was scheduled to teach, and President Daniel reassigned him to a position as Special Assistant to the President. In that capacity, Moore was responsible, among other projects, to re-establish *Tempo*, the then-inactive student newspaper. (Trial Tr. at 92-93.) Moore reported to Daniel directly until December 26, 2007, when Daniel appointed Moore to the position of Executive Director for Communications. In that capacity, Moore reported directly to Dr. Beverly M. John, Interim Vice President for Administrative Services and Enrollment Management. (Letter from Daniel to Moore of 12/26/2007, Pls.' Ex. 12.) Moore signed a one-year employment contract on January 17, 2008. (Defs.' Ex. 5.) In September 2008, as explained below, Moore was reassigned to report to Patricia Arnold, Executive Director of University Relations. (UF ¶¶ 5, 14.)

Plaintiff George Providence II was, at age forty-eight, an unconventional college sophomore at CSU who had previously attended several other colleges, including Oakton Community College, where he had served as editor of that college's student newspaper. (Trial Tr. at 175-76.) In March 2008, when *Tempo* resumed operations, Providence became a columnist for the paper, but within a few weeks, he was elevated to editor-in-chief. (*Id.* at 178-79; UF ¶ 11.) Providence served in that capacity until the spring semester of 2009, when he resigned as editor and withdrew from the University. Providence currently owes CSU an outstanding tuition debt (Trial Tr. at 361), but is otherwise free to return to campus as a student.[4]

---

[4] On summary judgment, Defendants argued that Providence lacked standing and that his claims were moot in light of his absence from CSU beginning in the fall semester of 2009. The court overruled those challenges. The court observed that the alleged deprivation of his chosen forum for expression is an actual injury under the First Amendment for which Providence
(continued...)

Defendant Dr. Wayne Watson is the President of CSU, and Defendant Erma Brooks Williams is the chief public relations officer at the University. Both Watson and Williams assumed their positions after the relevant events in this case occurred. Upon Plaintiff's motion, they were substituted as Defendants in place of their predecessors, Interim President Dr. Frank G. Pogue and Executive Director of University Relations Patricia Arnold. (Minute Entry [34].) Pogue replaced President Daniel after a well-publicized scandal involving the misappropriation of school funds reportedly forced her resignation in June 2008. *See Improper Spending at School, Audit Says*, CHI. TRIB., May 16, 2008, at Metro 3; Jodi S. Cohen, *Fractured Chicago State Picks Interim Chief*, CHI. TRIB., May 8, 2008, at Metro 3 . CSU hired Patricia Arnold in August 2008 to manage marketing and public relations matters as Director of University Relations. (Trial Tr. at 14-15.)[5] Before arriving at CSU, Arnold had a career as a public relations consultant, having worked earlier as a broadcast journalist at KSTP TV in Minneapolis and then for ABC 7 Chicago. (*Id.* at 13-14.) After a month at CSU, she was promoted to Executive Director of University Relations, becoming Moore's direct supervisor. (*Id.* at 15-16.) The date of, or reasons for Arnold's departure from the University are not in the record.

## II.    *Tempo*

Until it ceased publication in April 2009, *Tempo* was the official student newspaper of Chicago State University. The newspaper has been published only sporadically over the course

---

[4](...continued)
has standing to sue. *Moore*, 738 F. Supp. 2d at 828. Further, Providence had expressed interest in resuming his studies and his position with the newspaper, and because he alleges that he withdrew from CSU because of the harassment challenged in this lawsuit, the court concluded his claims are not moot. *Id.* at 829. The court declines Defendants' invitation to reconsider that decision.

[5]    Arnold explained that she was hired by Katey Assem, Interim Vice President for Institutional Advancement, who became Arnold's direct supervisor. (Arnold Dep., Ex. E to Defs.' Statement of Facts in Supp. of Their Mot. for Summ. J. (hereinafter "Defs.' 56.1"), at 7; Trial Tr. at 81-82.)

of its history, and not at all during 2006 and 2007. (Pls.' Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. (hereinafter "Pls.' 56.1") ¶ 10.) The record does not reveal why *Tempo* ceased publication in 2006, but in 2007, the University made a concerted effort to re-establish *Tempo* after an accreditation association commented unfavorably on the absence of a student-run newspaper at the University. (Trial Tr. at 93-94.)

After President Daniel charged Moore with re-establishing the paper, Moore issued a memorandum entitled "The Way Forward: Re-establishing the College Newspaper at Chicago State University." (Memorandum, Pls.' Ex. 5.) Moore's memorandum presented a series of recommendations based upon Moore's research into the successes and failures of college newspapers at historically black colleges and inquiries Moore made with other college newspapers in Illinois. (Trial Tr. at 96-97.) These recommendations included proposals for establishment of an advisory committee and the hiring of a full-time business manager. (Pls.' Ex. 5, at 2-3.) In the memorandum, Moore also cautioned against requiring students to submit the paper to a college administrator for prior review, noting that the Illinois legislature had recently passed the College Campus Press Act, designating student-run college newspapers as public forums. (*Id.* at 9-10.)

The memorandum was well received by administrators at the University, including President Daniel, who gave Moore the go-ahead to re-establish *Tempo*. (Trial Tr. at 99.) As recommended in the memorandum, in January 2008 the University hired Timothy Edwards as *Tempo*'s business manager, responsible for administrative aspects of the paper such as distribution, advertisement, and expenses. (*Id.* at 332-33.) In March 2008, *Tempo* resumed regular operations as a weekly newspaper and, within a few weeks, Providence became editor-in-chief.

Once *Tempo* resumed operations, Moore served as faculty advisor. As Moore had proposed in his memorandum on re-establishing *Tempo*, the faculty advisor's role was to advise the students on proper journalistic process and protocol. (Pls.' Ex. 5, at 11.) Specifically, his memo described the faculty advisor's role as "safeguard[ing] the journalistic integrity of the

newspaper" by "making sure that proper journalistic protocols are followed in gathering and reporting of the news." (*Id.*) To that end, Moore distributed to the *Tempo* staff copies of "The News Writer's Handbook," obtained from the website for the Journalism Education Association and adopted by Moore for *Tempo*'s purposes with permission from the author. (Trial Tr. at 101-03.) Moore also arranged to have *Tempo* staff meet with staff members of *The Chicago Maroon*, the University of Chicago's independent student newspaper, to learn about newspaper layout and formatting. (*Id.* at 121.) In his memorandum, Moore was careful, however, to note that a faculty advisor was "not charged with the responsibility of reporting, editing copy, or determining what stories are actually published in the paper. As with any newspaper, the editorial policy of the student newspaper is independent of its day-to-day administration and management." (Pls.' Ex. 5, at 11.) Consistent with this understanding of a faculty advisor's role, Moore never asked Providence to provide him a draft of an issue before it was published, although Moore and Providence did often discuss article ideas that Providence was considering for Providence's own column. (Trial Tr. at 191-92, 194.) Instead, Moore met with Providence each week after that week's issue was published to review the issue, page by page, and discuss mistakes and areas for improvement. (*Id.* at 192-93.)

During the spring semester of 2008, Providence and his staff published a number of articles that were critical of the University and its administration, including Moore's direct supervisor at the time, Interim Vice President Beverly John. On April 10, 2008, for example, *Tempo* ran an article criticizing CSU's athletic department for delays in distributing scholarship funds to student athletes. (*Tempo*, Apr. 10, 2008, Pls.' Ex. 16, at 1.) The article quoted John, who in response to questions about why President Daniel failed to meet with the complaining student-athletes, reportedly stated, "[T]he students have to understand that there is a protocol and process in place. They must meet with their coaches, then the athletic director and so on before coming to the administration." (Pls.' Ex. 16.) The next week, *Tempo* ran a story on the arrest of CSU's head baseball coach for

allegedly assaulting a team member. (*Tempo*, May 8, 2008, Pls.' Ex. 17, at 1.) In an editorial written by Providence several weeks later, Providence insinuated that the Board of Trustees should fire John for scandals that included problems in the athletic department. (*Tempo*, May 8, 2008, Pls.' Ex. 20, at 2.)[6] In the last issue of the spring semester of 2008, *Tempo* published yet another controversial article, quoting the University's Financial Aid Director as having made derogatory and racially-charged statements about the CSU student body.[7] When asked for comment, the article quotes John as stating:

> I know you think that you have unearthed something that is damaging to this university, and I will not assist you in furthering it along. You shalln't [sic] get a comment from me. The job of the journalist is to search for the spectacular, and I know that that is what you are trying to do. . . . You need to search your soul as a journalist and as a human being, about what your motivations are for doing this kind of story.

(*Tempo*, May 15, 2008, Pls.' Ex. 21, at 1.)

In the wake of this last article, Robyn Wheeler, Director for Media and University Relations, called Moore on May 16, 2008, to suggest "instituting a policy to require administrators to go through a screening process before they would talk to student journalists." (Trial Tr. at 146.) In response to this proposal, Moore sent a memorandum to Dr. Sandra Westbrooks, Provost and Vice

---

[6]     In addition to any news articles that Providence wrote for the paper, as editor he published an editorial column entitled, "Yeah. I Said It." He also regularly published an editorial column entitled "The 3: Interrogatives Requiring a Response," in which he asked a series of insinuating or rhetorical questions, often targeted at perceived problems with CSU administration. On occasion, Providence solicited the CSU community to submit questions for "The 3." (*Tempo*, October 9, 2008, Pls.' Ex. 31, at 2.)

[7]     *Tempo* reported that during an interview with a *Tempo* staff reporter, the Director

> lambasted members of the student body for succumbing to what she believes are a variety of cultural ills that have slowed the success of the university's mostly black population. Citing black students' failure to read, along with frequent pregnancies and so-called ghetto behavior, [the Director] also used choice words to describe white students. While praising them for being more astute than their black counterparts she further described them as "dirtier than any other" group of people.

(*Tempo*, May 15, 2008, Pls.' Ex. 21, at 1.)

President of Student and Academic Affairs,[8] in which Moore cautioned against "requiring student reporters to get approval before interviewing members of the University administration" because he believed limiting student reporters' access to administrators would be perceived as limiting press freedom. (Memorandum, Pls.' Ex. 22.) Moore testified that to his knowledge, Wheeler decided against adopting such a policy. (Trial Tr. at 141.)

Some time between late August and early September 2008, Moore sought to carry out another of the recommendations he had set forth in his memorandum: establishing an advisory board for *Tempo*. Moore invited Linda Simpson, a subordinate within his department, and Patricia Arnold, who had recently been hired by Interim Present Pogue, to join the board because both Simpson and Arnold had journalism experience. (*Id.* at 146.) In addition to "help[ing] improve the paper, provid[ing] guidance to the student editors and the editorial board and . . . tak[ing] some of the pressure off [him]," Moore hoped the advisory board would help dispel "rumors that were floating around the campus that [he] was the one instigating the articles that were critical of the university." (*Id.*)

As a member of the advisory board, Arnold offered to edit each issue before it went to print in order to correct the many grammatical and spelling errors that plagued the newspaper.[9] According to Moore, when Arnold first raised the issue in an advisory board meeting,[10] Moore attempted to explain that public university administrators lack authority to review the paper prior to publication and that review by such administrators generally occurred after publication, as had

---

[8]    The court infers that as a student-run organization, *Tempo* fell within the institutional jurisdiction of Westbrooks's office.

[9]    The court's own review confirms that *Tempo* issues were riddled with frequent and egregious spelling and grammatical errors, including for example, "Octoberr" and "Feburary" in the date line.

[10]    It is not clear from the record whether this meeting occurred before or after Arnold was assigned as Moore's supervisor.

been his practice in advising Providence. (*Id.* at 151.) According to Moore, reviewing issues after they were published did not make sense to Arnold. (*Id.*) After Moore relayed Arnold's pre-publication review offer to Providence, Providence responded directly, explaining in an e-mail message to Arnold on September 24, 2008, that while he could not acquiesce to a request "to review upcoming issues of Tempo prior to their publication," he asked the advisory board to "commit to going over each issue of Tempo and marking it up with respect to its shortcoming and deficiencies." (E-mail, Pls.' Ex. 23.) In an e-mail reply sent the next day, Arnold wrote that she was not sure how marking up issues after publication would be useful. (*Id.*) She asked, "If you misspell words, for example, how would remarks on an old issue address those errors, unless you're using the same words in subsequent issues? Ditto for syntax, punctuation." (*Id.*) She also questioned whether inexperienced student editors were capable of proofreading the paper. (*Id.*) Arnold concluded that proofreading the paper after publication was not a productive use of her time. (*Id.*) Several days later, Arnold followed up with an e-mail message dated October 6, 2008, in which she explained that she would no longer serve on the advisory board "since advisory board members are not allowed to point out spelling and grammar errors and violations of journalistic standards prior to publication." (E-mail, Pls.' Ex. 30.)

## III. Moore's Termination

By the end of the 2008 spring semester, Moore's relationship with Interim Vice President John had deteriorated as a result of *Tempo*'s reporting. (Trial Tr. at 127-28.) At the beginning of September 2008, Moore and Linda Simpson asked Interim President Pogue for a different reporting line because of the mounting tension. (*Id.* at 167-68; Moore Dep., Ex. F to Defs.' 56.1, at 149-151.) Pogue granted their request and Moore was reassigned to report to Katey Assem, Patricia Arnold's supervisor. (More Dep. at 151.) Shortly thereafter, Patricia Arnold, whom Pogue promoted to

Executive Director for University Relations in an administrative reorganization, became Moore's direct supervisor on approximately September 14th or 15th. (UF ¶ 5, 14; Trial Tr. at 147.)

In late September 2008, Arnold asked Moore to prepare two press releases on behalf of the University. Arnold explained that she needed assistance from her staff in writing press releases because she had been charged by Pogue to issue five press releases per week. (Trial Tr. at 392-93.) She chose to assign release writing to Moore after he disclosed, in response to a "capabilities survey," that he had ten years' experience in news releases. (*Id.* at 397; Defs.' Ex. 9.) Moore delivered the first press release to Arnold via e-mail on September 25, 2008, and the second on September 30. (Defs.' Exs. 7, 8.) Arnold found both of these submissions unsatisfactory. (Trial Tr. at 399.) Arnold testified that Moore's press releases were deficient because they lacked a headline, lacked a release date, and lacked hash marks signifying where the release ended. (*Id.*) Additionally, one of the press releases covered the wrong event; Arnold claims she asked Moore to write a press release about the dedication of the new Convocation Center coming up on October 7, 2008, but Moore instead prepared a press release about the convocation ceremony at the start of the new semester that had occurred at the Convocation Center on September 10, twenty days earlier. (*Id.* at 398; Defs.' Ex. 7.) Moore claims that Arnold never explained to him that she needed final drafts for the press releases, so he prepared only rough drafts. (Trial Tr. 149-50.) Arnold concedes she never informed Moore about her dissatisfaction with the quality of his work. (*Id.* at 399-400.)

On September 29, 2008, Interim Vice President Beverly John sent Arnold a transition memorandum, ostensibly to provide Arnold with some "insight" concerning the staff members who had been transferred to Arnold's supervision. (Transition Memo, Pls.' Ex. 27.) John's memo was critical of Moore's credibility and performance, particularly regarding his work with *Tempo*. Specifically, John accused Moore of "buil[ding] a tenor of dishonesty and deceit" at the University. (*Id.*) "I firmly believe that[ ] Moore is behind the negative tenor of the student newspaper," John

wrote.  (*Id.*)  She further accused Moore and Providence of "soliciting non-TEMPO staff to encourage employees to speak with the paper since many have come to link Moore with the negative stories."  (*Id.*)  At trial, Arnold confirmed her deposition testimony that sometime at the end of September or the first week of October, she received the memo in interoffice mail and contacted John to discuss it.  (Trial Tr. at 32.)

On October 6, 2008, Arnold sent an e-mail message to Moore, Providence, and Linda Simpson, notifying them that she had "just learned inadvertently that it is a conflict of interest for this department's staff members to serve as advisers to student media because, as the College Media Advisers' *Code of Ethics* states: 'The publicity interests of the university and the news goals of the student media are often incompatible.'"  (E-mail, Pls.' Ex. 30.)[11]  Arnold concluded specifically that it was a conflict of interest for Moore, as the "University's Director of External Relations" to continue to serve as *Tempo*'s adviser.[12]  Arnold testified that she had come across the College Media Advisers' website while searching for information on prior review during her previous e-mail exchange on that subject with Moore and Providence.  (Trial Tr. at 412.)  Arnold asked for a list of eligible faculty member replacements within two days because, she explained, she wanted a new adviser installed no later than October 15.  (E-mail, Pls.' Ex. 30.)  Arnold also asked Moore "to remain as interim adviser[ ] until a faculty or staff member from another department assumes that role permanently."  (*Id.*)

---

[11]     This was the same e-mail message, described earlier, in which Arnold indicated that she would no longer serve on the advisory board.  Notably, Arnold did not mention her role as head of the University's public relations department as a reason why she herself would not serve on the advisory board.

[12]     Moore's actual title was Executive Director for Communications.  (Pls.' Ex. 11.) Interim Vice President Beverly John also misstated Moore's title in her transition memo, referring to Moore there as Executive Director of Internal Affairs & Events Management.  (Transition Memo, Pls.' Ex. 27.)  The court infers that the confusion about titles was a result of the upheaval within the University's administration following President Daniel's departure and Interim President Pogue's arrival.

On October 9, 2008, *Tempo* published the first part of a two-part article, entitled *Smoke and Mirrors*, which questioned discrepancies in the funding of a fashion show hosted by a student-run modeling organization the prior semester. The show featured performances by DJs from a local radio station and an R&B singer. (*Tempo*, Oct. 9, 2008, Pls.' Ex. 37, at 1.) According to the articles, the student organization was the first to host an event at the newly built Convocation Center, which took place, coincidently, on the day the *Chicago Tribune* ran a story on financial irregularities at the University. (*Id.*; *Tempo*, Oct. 16, 2008, Pls.' Ex. 38, at 1.)[13] The *Tempo* article reported that a former member of the organization questioned how the organization, which reportedly started the school year with $1500, had acquired the funds necessary to host an event estimated to cost approximately $22,000.

Arnold and Moore discussed the first article the day it was published, October 9, 2008, in Arnold's office. (Trial Tr. at 159-60.)[14] According to Moore, the first statement Arnold made upon his arrival in her office was that "George is out of control. He needs to be stopped. He is hurting people." (*Id.*) Moore also testified that Arnold told him that she felt that the article was libelous and that the University might be subject to suit. (*Id.*) In response, Moore contends, Moore told Arnold, "George can be difficult at times . . . but as to the story itself, whether or not he . . . had a right to publish that[,] I said it's a legitimate question. I said the discrepancies between the reported $1500 that the student organization had on hand and the estimated cost of $22,000 of the event, I said that's a huge discrepancy, which poses a legitimate journalistic question." (*Id.* at 160-61.) Moore recalls that Arnold, in reply, told him that the funding of the event "was a private matter, that there were donors that supported the event, and that they had a right to remain private and that it was

---

[13]     The articles do not report the date of the event, but the court infers from the date of the referenced *Chicago Tribune* article that the event occurred on April 25, 2008. *See Chicago State Burned Again*, Chi. Trib., April 25, 2008, at 24.

[14]     The paper was published weekly on Thursdays. (*Id.* at 161-62, 192.)

none of George's business." (*Id.* at 161.)  At one point at trial, Arnold denied having met with Moore to discuss the article (*Id.* at 435), but the court credit's Moore's version.  Arnold's denial is inconsistent with (a) an affidavit she signed, in which she recalled Moore asking her about the article (Arnold Aff. ¶ 3, Ex. B. to Defs.' Answer to Pls.' 56.1), and (b) her own earlier trial testimony in which she admitted having a conversation with Moore in which she commented on "how unconscionable [the article] was," but denied saying anything about Providence.  (Trial Tr. at 422.) Moore characterized Arnold's demeanor during the conversation as "either angry or extremely frustrated."  (*Id.* at 161.)  Indeed, Arnold herself testified that she was "outside [her] body with rage" upon reading the article.  (*Id.* at 421.)

The next day—Friday, October 10, 2008—Arnold sent a letter to Interim President Pogue recommending Moore's termination, "effective immediately."  (Letter, Pls.' Ex. 34.)  Arnold explained that the "University Relations department requires a public relations professional in the position of Executive Director of External Relations" and that Moore did not "have the required skill set or experience in the field."  (*Id.*)  Arnold testified that she based her stated conclusions upon Moore's unsatisfactory performance writing the two press releases.  (Trial Tr. at 65.)  Arnold denies that her decision to terminate Moore had anything to do with his role as advisor to *Tempo*.  (*Id.*) Arnold also testified that prior to this letter, she had conferred with her immediate superior, Katey Assem, about her need for a public relations professional and the prospect of transferring Moore to a different department.  (*Id.* at 402.)  According to Arnold, Assem informed her that Interim President Pogue recommended that the University hire Brian Pitzer, the public relations director at Edinboro University, where Pogue had previously served as a college president.  (*Id.* at 403.)[15]

---

[15]    The record does not reveal when Arnold approached Assem, nor does the record show who hired Pitzer, when that decision was made, or when Pitzer agreed to take the position. Arnold testified that Pitzer began working at CSU on October 13, 2008.  If this is true, then surely Pitzer was hired before October 10, 2008, when Arnold recommended Moore's termination.

Arnold further testified that she decided to recommend Moore's termination after the director of human resources informed her that he "couldn't think of anyplace else to put [Moore]." (*Id.* at 408.)

In a letter dated October 13, 2008, Pogue notified Moore of his termination, effective immediately. (Letter, Pls.' Ex. 35.) There is no evidence that Pogue took any steps to independently review or investigate Arnold's decision, and the timing suggests he did not: Arnold recommended Moore's termination on Friday and Pogue terminated Moore the following Monday. Pogue's letter explained that Moore was relieved of his duties at the University immediately and, though he would continue to receive his full salary until the expiration of his contract on December 31, 2008, his contract would not be renewed for the following year. (*Id.*) Pogue sent copies of his letter to Arnold and to the Director of Human Resources, Kevin Morris, and advised Moore to direct any questions about the decision to Arnold. (*Id.*)

## IV. University Conflict with Providence and *Tempo*

At about the time of Moore's termination, Providence began clashing with Arnold over the newspaper's access to interviews with University staff. Providence contends that Arnold instituted a protocol requiring Providence to seek Arnold's approval before interviewing University staff or people associated with student organizations funded by the University. (Trial Tr. at 225.) Arnold insists that she merely requested that *Tempo* abide by the same protocols that she imposed on every other news outlet. (*Id.* at 417-18.) Specifically, Arnold asked that *Tempo* and other news outlets alert her office "as a courtesy" before they interviewed University employees. According to Arnold, she inferred from a notebook of reporter requests kept by her predecessor that representatives of the press came to the University's public relations department first before they contacted University employees. (*Id.* at 49.) As discussed above, however, while Arnold's predecessor, Robyn Wheeler, had discussed requiring *Tempo* to obtain approval before

interviewing University personnel, there is no evidence that such policy had been previously adopted.

The issue came to a head during Providence's investigation for the *Smoke and Mirrors* articles. Providence testified that he and another *Tempo* reporter conducted two interviews with the leader of the student organization that had sponsored the fashion show, but then, after the student spoke with the organization's faculty adviser, the student refused to answer questions about the organization's finances at a third interview unless Providence first went through Arnold. (*Id.* at 215-16.) According to Providence, it was at this point that Arnold informed him of the protocol for alerting the public relations department about interviews with University staff. (*Id.* at 216.) In an attempt to comply with the protocol, Providence sent Arnold a series of questions concerning the event's funding in an e-mail message dated September 28, 2008, and requested that Arnold arrange an interview with the student leader and faculty advisor. (E-mail, Pls.' Ex. 26.) In an e-mail reply, Arnold informed Providence that she would "submit the questions and find out what's more convenient for them." (*Id.*) Providence testified that he was unable to conduct the requested interview after that exchange. (Trial Tr. at 216.) Similarly, on October 8, 2008, Providence addressed questions for the University's chief of police to Arnold when the chief refused to answer questions about the cost of providing security for the fashion show without clearance from Arnold. (*Id.* at 317; E-mail, Pls.' Ex. 32.)

On October 15 and 16, 2008, Arnold and Providence exchanged a series of e-mails in which they discussed Providence's request that the University make an exception to the protocol for *Tempo*. (Pls. Ex. 37.) On October 15, 2008, Providence sent an e-mail message to Arnold and Interim President Pogue in which Providence objected to "the university's protocol of requiring Tempo reporters [to] first interact with University Relations before being able to speak to CSU faculty, staff, and leaders of student organizations," criticizing the protocol as "incredibly cumbersome" and as "an attempt at censorship." (*Id.*) Providence stated that he had discussed

15

the issue with the Associated Collegiate Press and the Student Press Law Center, and that he planned to make "open document" requests if the University did not reverse the protocol. (*Id.*) Arnold responded that the protocol was simply a "courtesy," that it applied to all news outlets, that she never told University staff not to speak with *Tempo* reporters, and that her office did not "filter the request or the response to the request." (*Id.*) In fact, the record shows that although the protocol nominally applied to all news outlets, Arnold focused on *Tempo*, and used the policy as a tool to at least monitor, if not control, *Tempo*'s news gathering. For example, when asked who instituted the protocol, Arnold testified, "The protocol actually was in place before I arrived, but there was a heightened sense, particularly with *Tempo*, to have that protocol instituted." (Trial Tr. at 48.) Furthermore, Arnold explained the need for the protocol by testifying, "There was an issue on campus. People did not want to pick up the phone and have someone from *Tempo* on the other end." (*Id.* at 418.) The court concludes that the protocol implemented by Arnold was directed specifically to *Tempo* in the same manner as the policy that had been proposed, but not implemented, by Robyn Wheeler.

On October 30, 2008, Arnold sent *Tempo* a letter to the editor, signed by a number of high-level University administrators. (E-mail, Pls.' Ex. 40.) Providence published the letter in *Tempo* the following week, November 6, 2008. The letter says, in part:

> In recent issues, you have lobbed anti-Semitic, homophobic, and mean-spirited personal attacks that demonstrate that you are out of step with the expectations of the CSU family.[16]

_____

[16]    The letter's accusation of homophobic attacks refers to comments, reported in the second part of the *Smoke and Mirrors* series, insinuating that the student organization leader and the organization's faculty advisor were engaged in a homosexual relationship. (Trial Tr. at 421-22; *Tempo*, October 16, 2008, Pls. Ex. 38, at 1.) The letter's accusation of anti-Semitism refers to an editorial cartoon, obtained from an outside news service, published in the September 25, 2008 issue. (*Tempo*, Sept. 25, 2008, Pls. Ex. 25, at 3.) The cartoon had been the subject of a previous letter to the editor in the October 9, 2008 issue signed by numerous CSU professors who objected to the cartoon's use of imagery the professors characterized as portraying "Israel as the fat rich Jew." (*Tempo*, Oct. 9, 2008, Pls.' Ex. 31, at 2.)

The First Amendment grants Tempo the right to force literate members of this community to suffer the humiliation of its poor news judgment, grammar, spelling, punctuation, syntax, layout and other faux pas that reflect poorly on the quality of teaching and learning at this institution of higher education. We do not wish to deny you that right—or the right to treat others in ways that you would not want to be treated.

However, [the school's leadership] is committed to fostering civility, respect, fair play and collegiality. Therefore, we request that you not represent us in print as promoting behavior or values that fall far short of those high standards.

(*Tempo*, November 6, 2008, Pls.' Ex. 41, at 2.)

On December 11, 2008, Arnold wrote another letter to the editor, addressing a question Providence had posed in his editorial column, "The 3: Interrogatives Requiring a Response," in the last issue of the fall semester of 2008. In that editorial, Providence had questioned the propriety of the school's decision to invite Arnold's daughter, evidently a recording artist, to perform at a University event. (E-mail, Pls.' Ex. 44.)[17] In her letter to the editor, published on January 29, 2009, Arnold wrote: "A credible journalist doesn't ask insinuating questions; he tries to find answers, if improprieties are suspected. . . . [Y]ou're sweating the small stuff—or making it up as you go along, whichever is more convenient. How sad for us all." (*Tempo*, Jan. 29, 2009, Defs.' Ex. 20.) Providence sent Arnold an e-mail message confirming that her letter would run in the next issue and asserting that the question that had appeared in his editorial had originated "from a few of your peers." (E-mail; Pls.' Ex. 44.) Arnold replied:

Thank you, however, you use the term "peers" quite loosely. . . . Not one of my peers—administrators of this university—was involved in this mean-spirited, irresponsible and infantile mud-slinging.

---

[17] Neither party has provided the court a copy of the issue in which the editorial initially appeared, but the issue in which Arnold's letter to the editor appears reproduces the editorial to which she was responding. (*Tempo*, Jan. 29, 2009, Defs.' Ex. 20.) The editorial asked: "In the shadow of the most recent university-wide ethics review, what was executive Director of University Relations Patricia Arnold thinking? We are sure that there were no improprieties committed, but by scurrying about the Student Union building and getting underfoot of staff to ensure that all was in order for her daughter Maiysha's appearance on campus, Arnold did much to undermine that confidence." (*Id.*)

. . . .

. . . You and your interim advisor are wholly liable for not verifying facts before implying in print that I have committed ethics violations . . . .

This is a very serious charge that you made. It could have seriously harmed me personally and professionally. I am sure the intent was to put me in the hot seat. Unfortunately for you and the cabal, Dr. Pogue and [another University administrator approved of Arnold's daughter's performance]. . . .

I'm sure you don't advise your children or grandchildren to be dishonest, destructive, unprofessional, vindictive and mean-spirited. You don't have to: they learn from your behavior. This is a reap-what-you-sow world; you'll get an opportunity to learn from your behavior.

You have been entrusted with $20,000 of tax dollars per semester to be the voice of CSU students.[18] What are you saying on their behalf? More important, why in the world are you saying it, George?

(E-mail, Pls.' Ex. 45.) It is unclear from the context of the e-mail itself whether Arnold's references to *Tempo*'s "interim advisor" and "the cabal" were references to Moore or to Marvey Jackson, CSU's Executive Director of Student Activities, who succeeded Moore as the newspaper's interim faculty advisor in October 2008 after Moore's termination.

On December 31, 2008, the University terminated Timothy Edwards, *Tempo*'s business manager. (Trial Tr. at 351-52.)[19] The University had previously renewed Edwards's employment contract for the fall semester of 2008 after his previous employment contract ended on June 30, 2008. (*Id.* at 349-50.) The University did not appoint a replacement, apparently eliminating the

---

[18]    In fact, *Tempo*'s operations were funded not by tax dollars, but through student activity fees, used to pay for various student activities including the student newspaper. (UF ¶ 15.)

[19]    The record does not reveal who made the decision to terminate Edwards or when that decision was made. Edwards was responsible for such administrative tasks as paying bills, distribution, and managing advertising accounts; neither party has suggested that Edwards's role as a University employee influences the question of whether *Tempo* is a public forum. To the contrary, the College Campus Press Act defines "campus media" as "any matter that is prepared, substantially written, published, or broadcast by students," and provides that collegiate media outlets are public forums "whether campus-sponsored or noncampus-sponsored." 110 ILCS 13/5, 13/10.

business manager position entirely, and Edwards testified, without elaboration, that he believed the controversial content in *Tempo* motivated his termination.  (*Id.* at 359.)

In January 2009, Providence sent an e-mail to *Tempo* staff, announcing that the spring semester would be his last as *Tempo*'s editor.  (E-mail, Pls.' Ex. 47.)  Providence explained, "After three semesters at the helm, I'd like to give more time to my studies and my writing.  If I don't get on the good foot soon my granddaughters will graduate before I do, so I've got to bounce."  (*Id.*)  Providence testified that he resigned because his grades were suffering as a result of the "heavy load, serving as editor of the paper."  (Trial Tr. at 271.)

In January 2009, Providence asked Howard Johnson, Interim Vice President for Student Affairs and Enrollment Management, to appoint Professor Quraysh Lansana as *Tempo*'s permanent faculty advisor.  (E-mails, Pls.' Ex. 47; Trial Tr. at 258-59.)  Providence had met Lansana, an Assistant Professor in the English Department, at a reading for upcoming master's graduates of the creative writing program in the spring of 2008, at which Lansana complimented Providence's work at the newspaper and offered to help.  (Trial Tr. at 256-57.)  Lansana had served as *Tempo*'s faculty advisor from 2002 to 2004, before Moore re-established the paper in 2008.  (*Id.* at 278-79.)  As a result of conversations with University officials, Lansana understood that he would work with the paper to alter its editorial direction and content.  In a memorandum to Johnson memorializing a conversation about Lansana's resuming as *Tempo*'s faculty adviser, Lansana explained that "[t]hese young people need to understand the difference between investigative journalism and a witch hunt."  (Memorandum, Pls.' Ex. 46.)  Lansana further addressed the need for *Tempo* to alter its content, such as greater focus on campus events and "tie-in[s]" to local and national news.  Lansana opined that although "[t]he newspaper is not a product of the Office of University Relations . . . the paper can and should function as an integral part of the public relations missions, defined in the broader sense, of the university.  It can and

should ask hard questions of administrators, faculty and students. Tempo should also celebrate CSU by reporting on events and people that make this place work." (*Id.*)

To that end, Lansana requested that Providence provide pre-publication copies of articles for Lansana's review. (Trial Tr. at 294-95.) On one occasion in February 2009, Providence came to Lansana's office expecting Lansana to offer advice on stories for the upcoming issue, but Lansana instead took pre-publication copies of articles and told Providence that he would return them after he had the opportunity to edit them. (*Id.* at 265.)[20] Providence contends that he later saw one of Lansana's assistants in possession of one of the articles, but that Lansana never returned the articles to Providence. (*Id.* at 266.) At Lansana's insistence, Providence also provided a "rundown" for the February 19, 2009 issue, listing, in Providence's words, the "various stories that are going to appear in a particular issue, what the subject matter is, who's writing them, what the tack is going to be, [and] what tack is going to be taken with respect to the stories." (*Id.* at 267.) After reviewing the rundown, Lansana decided that there was not enough "original content," and directed that the paper not be published that week. (*Id.* at 297.)[21]

Providence strongly objected to Lansana's unilateral decision to delay publication. In an e-mail message to Lansana and Interim Vice President Howard Johnson, Providence noted that

---

[20] It is unclear when this incident occurred. Judging from other evidence in the record, the court infers that the articles were intended for the February 19, 2009 issue, the same issue for which Providence later provided Lansana with a "rundown."

[21] The court notes from its own review that the previous two issues contained very little content written by CSU students. The February 5 issue contained Providence's two editorials and a two-page spread soliciting readers to submit their thoughts on Interim President Pogue's tenure at CSU. (*Tempo*, Feb. 5, 2009, Defs.' Ex. 20.) The only original student content in the February 12 issue consisted of a report by Providence on an upcoming appearance by Reverend Jesse Jackson at CSU. (*Tempo*, Feb. 12, 2009, Defs.' Ex. 20.) The issues were otherwise populated by articles from news services. The Sports page for *Tempo* had always consisted of news releases written by staff in the University's athletics department. The parties have not provided the court with a copy of the "rundown" for the February 19 issue, but the court infers from an e-mail sent by Lansana to Providence the following week that Lansana was then still in possession of four "original stories" that Providence had intended to publish in that issue. (E-mail, Pls.' Ex. 50.)

since *Tempo* had resumed operations in 2008, "it [had] been produced without fail every week" with one exception. (E-mail; Pls.' Ex. 49.)[22] Providence also registered his objection to Lansana's insistence upon reviewing the paper prior to publication: "[T]here is no way that I can, in good conscience agree to allowing [Lansana] the privilege of prior review of the student newspaper. Nor can I continue to cosign his insistence that he not only see every article before the paper goes out, but that he, or his designates [sic], would actually edit the articles themselves, sans any student contribution or comment." (*Id.*) The next week, when Lansana notified Providence via e-mail that Lansana had "yet to receive the rundown or any original stories (other than the four from last week)," Providence, in his reply, renewed his objection to Lansana's insistence upon prior review. (E-mail; Pls.' Ex. 50.)

*Tempo* did not publish another issue until April 16, 2009, when Providence sent an issue to print without Lansana's knowledge. (*Tempo*, Apr. 16, 2009, Pls.' Ex. 51; Resignation Letter, Pls.' Ex. 52.)[23] As a result of Providence's "insubordination," Lansana sent Interim Vice President Howard Johnson a letter of resignation as faculty advisor on April 21, 2009. (Resignation Letter, Pls.' Ex. 52.) In the letter, Lansana explained that he was resigning because of his inability to control Providence or to "work with" *Tempo*'s content:

---

[22] The exception was a delay in the publication of the first issue of the spring semester of 2009. (E-mail; Pls.' Ex. 49.) Providence explained that delay was the result of temporary confusion over who was responsible for processing stipends paid by the University to *Tempo*'s Editor-in-Chief, Managing Editor, and Production Editor. (Trial Tr. at 364-65; E-mail, Pls.' Ex. 49; Pls.' 56.1 ¶ 20.)

[23] Although witnesses could not recall at trial whether any issues were published in the month of March, the Court infers from the issue numbers that no issues were published between February 12 (Issue 19) and April 16 (Issue 20). (*Tempo*, Feb. 12, 2009, Defs.' Ex. 20; *Tempo*, Apr. 16, 2009, Pls.' Ex. 51.) After Lansana delayed publication of the February 19th issue, the next issue was also delayed because Lansana was out of town and Providence, who did not have a key to the student activities office, could not gain entrance to the office at night—when he and the production editor ordinarily formatted the issues. (E-mail, Ex. V to Pls.' 56.1.) The court infers from Providence's testimony that no issues were published in March because editorial staff had still not received their stipends, which were ultimately issued around May 2009. (Trial Tr. at 366.)

When I agreed to return to the post we spoke earnestly about my desire to work with the editorial direction and content, and not as the business manager. . . .

The current student editor, George Providence II, has consistently failed to provide requested information, return phone calls in a timely fashion, and made the decision to produce a paper before I had the opportunity to proofread the content. . . .   Mr. Providence, in short, has operated at his own discretion.  What rules are in place to hold him accountable for his insubordination?

(*Id.*)  Lansana informed Providence of his resignation on April 23, the same day that Providence published *Tempo*'s next issue, again without Lansana's prior review.  (E-mail, Pls.' Ex. 53; *Tempo*, Apr. 23, 2009, Pls.' Ex. 54.)

Providence testified that, after discussing the vacant faculty adviser position with Marvey Jackson, Providence invited Dr. Philip Beverly to serve as faculty advisor.  (Trial Tr. at 271.) Providence testified that *Tempo* published one more issue on April 30, 2009, with Beverly as faculty advisor (*Id.* at 269), although neither party submitted that issue into evidence.  Providence claims that no further issues were published because he did not have the key to *Tempo*'s space within the student activities office.  (*Id.*)  University officials typically maintain the keys and control access to all campus activity offices, including the space assigned to the newspaper.  (Jackson Aff., Ex. D to Defs.' Answer to Pls.' 56.1.)  Lansana testified that it was CSU policy to issue keys only to faculty and administrators.  (Trial Tr. at 324.)  Providence found it difficult to produce the paper when the University locked the student activities office because he generally prepared the paper for print at night and on weekends.  (E-mail, Ex. V to Pls.' 56.1.)  When Lansana became faculty advisor, he obtained a key from campus police sometime after February 27, 2009, and allowed Providence to use the key as needed to gain access to the office.  (Trial Tr. at 324; E-Mail, Ex. V to Pls.' 56.1.) After Lansana resigned, Providence held onto the key until Lansana asked him to return it, although the record does not reveal the timing of the request or when Providence complied with it.  (Trial Tr. at 324-35.)  Lansana testified that he returned the key to the police station.  (*Id.*) Providence attempted to obtain another key by contacting Marvey Jackson and Howard Johnson,

but he testified that nobody knew where the key had gone. (*Id.* at 269-70.) Without the key, Providence claims he was unable to produce any issues after April 30, 2009.

In the autumn of 2009, Providence opted not to return as a student to Chicago State. Providence owes the school approximately $3,000 in past tuition (*Id.* at 361), but is free to re-enroll there upon paying the past due tuition. As of the time of the trial, to Providence's knowledge, *Tempo* had not been published since September 2009. (*Id.* at 272.)

## DISCUSSION

**I.     Defendants' Motion to Dismiss Plaintiffs' State Law Claim**

Prior to trial, the Defendant filed a motion to dismiss Plaintiff's claims under the College Campus Press Act, 110 ILCS 13/1 *et seq.*, arguing that Plaintiff is barred by the Eleventh Amendment from pursuing such state law claims in federal court. In its previous opinion on the parties' cross-motions for summary judgment, this court concluded that the Illinois General Assembly did not waive the state's immunity from suits seeking monetary damages for violations of the First Amendment. *Moore v. Watson*, 738 F. Supp. 2d 817, 833-35 (N.D. Ill. 2010).[24] Instead, the court read the Act's remedial provision, 110 ILCS 13/20, as a waiver of the state's immunity from suits seeking injunctive or declaratory relief only. *Id.* at 834. Although the parties did not address the issue, the court mentioned in a footnote that it was "satisfied that the waiver set forth in 110 ILCS 13/20 extends to lawsuits in federal courts as well as state [forums]" because "[t]he Illinois statute explicitly refers to a federal constitutional right by invoking the public forum analysis under the First Amendment" and the statute "refers to 'relief as determined by a court,' making no distinction between the state and federal judiciary." *Id.* at 835 n.18.

---

[24]     As discussed in footnote 1, *supra*, this court did not address whether the Eleventh Amendment barred the state law cause of action because it did not understand Plaintiffs' complaint as bringing a claim under the state statute itself. Consequently, this opinion is the court's first opportunity to address the Eleventh Amendment as applied to the Illinois state claim.

Upon further reflection, and now with the aid of briefs by both parties, the court now concludes that the General Assembly also did not waive the State's sovereign immunity from suits for violations of state law.[25]  Because the court's previous opinion considered only Plaintiffs' § 1983 First Amendment claim against state officials in their official capacity, the footnote's discussion of waiver for suits seeking prospective relief was arguably unnecessary because such suits fall within the *Ex Parte Young* exception to the Eleventh Amendment.  That exception does not reach state law claims, however, and the Eleventh Amendment acts to bar a federal court from hearing pendent state law claims for injunctive or declaratory relief against state officials for violations of state law.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-106 (1984) (concluding that the *Young* exception is "inapplicable in a suit against state officials on the basis of state law"); *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993) ("Under [*Pennhurst*], we may not exercise pendent jurisdiction to adjudicate claims that state officials are violating state law because such claims are barred in federal courts by the Eleventh Amendment.").[26]  As the *Pennhurst* court made plain, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."

---

[25]     Dismissal of the state law cause of action does not, however, have a substantive impact on the resolution of this case because the state statute claims are duplicative of Plaintiffs' First Amendment claims.  Just as the Illinois statute provides for injunctive and declaratory relief, federal law allows Plaintiff to seek prospective equitable relief against Defendants, sued in their official capacities, for constitutional violations.  *See Nelson v. Miller*, 570 F.3d 868, 883 (7th Cir. 2009) (citing *Ex Parte Young*, 209 U.S. 123, 159-60 (1908)).  Furthermore, like the Illinois statute, 42 U.S.C. § 1988(b) allows for the award of attorneys' fees to prevailing parties in such actions. *See Bond v. Stanton*, 555 F.2d 172, 174 (7th Cir. 1977) (allowing for award of attorneys' fees in a suit brought against state officials in their official capacities).

[26]     Although Plaintiff argues otherwise, it is well settled in this circuit that Illinois state universities are arms of the state for purposes of Eleventh Amendment analysis.  *See Osteen v. Henley*, 13 F.3d 221, 223-24 (7th Cir. 1993) (Northern Illinois University); *Davidson v. Bd. of Governors*, 920 F.2d 441, 442 (7th Cir. 1990) (Western Illinois University); *Cannon v. Univ. of Health Scis.*, 710 F.2d 351, 356 (7th Cir. 1983) (Southern Illinois University).  Chicago State University is one such university.  *See* 110 ILCS 660/5-1 *et seq.*  Furthermore, the College Campus Press Act itself lists CSU within the statutes' definition of "State-sponsored institutions of higher learning."  110 ILCS 13/5.

*Pennhurst*, 465 U.S. at 106.  Where, as here, state courts have not had an opportunity to construe a state law, the intrusion is even greater.

A state may waive its sovereign immunity by consenting to suit, but such consent must be "unequivocally expressed." *Pennhurst*, 465 U.S. at 99; *see also Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305-06 (1990) ("The Court will give effect to a State's waiver of Eleventh Amendment immunity 'only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" (internal quotation marks omitted) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985)).  Furthermore, a state may waive sovereign immunity from suit in its own courts without waiving immunity from suit in federal courts.  *See Feeney*, 495 U.S. at 306 ("'[I]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court*.'" (quoting *Atascadero State Hosp.*, 473 U.S. at 241)).  Thus, "ambiguous and general consent to suit provisions, standing alone, [are] insufficient to waive Eleventh Amendment immunity." *Id.*  In *Feeney*, for example, the Court concluded that a bistate compact's statutory venue provision evidenced the states' consent to suit in federal court by providing that "'[t]he foregoing consent . . . is granted on the condition that venue . . . shall be laid within a county or judicial district established by one of said States *or by the United States*, and situated wholly or partially within the Port of New York.'" *Id.* at 307 (emphasis added) (quoting N.J. Stat. Ann. § 32:1-162; N.Y Unconsol. Law § 7106).

The College Campus Press Act makes no similar reference to federal courts.  And although, as the court noted previously, the Act "refers to 'relief as determined by a court,' making no distinction between the state and federal judiciary," *Moore*, 738 F. Supp. 2d at 834 n.18 (quoting 110 ILCS 13/20), the court now concludes that this language expresses no more than a general consent to suit, which is insufficient to demonstrate that the state consented to suit in federal court. Plaintiffs challenge this conclusion, noting the Act's use of the term "public forum," a term "used

and understood in First Amendment analysis." (Pls.' Opp. to Defs.' Mot. to Dismiss Claims Pursuant to the Illinois College Campus Press Act (hereinafter "Pls.' Opp. to Dismiss State Claims"), at 4.) Use of the term "public forum" is not limited to federal constitutional analysis, however: Illinois courts also use the term in applying the freedom of speech provision of the Illinois Constitution. *See* Ill. Const. art. 1, § 4; *People v. DiGuida*, 152 Ill. 2d 104, 126, 604 N.E.2d 336, 346 (1992) (concluding that a supermarket had not "presented itself as a forum for free expression" under the free speech provision of the Illinois Constitution); *People v. Yutt*, 231 Ill. App. 3d 718, 725, 597 N.E.2d 208, 213 (3d Dist. 1992) (concluding that a clinic that performed abortions had not "opened up its property as a public forum" under the Illinois Constitution). Thus, use of the term "public forum" does not unambiguously demonstrate that the Illinois legislature intended the Act to confer jurisdiction on federal courts to hear suits brought under the Act.

Plaintiffs contend that Defendants' motion to dismiss the state law claim, made thirty-one days before trial and almost two years from the commencement of the suit, is untimely. Indeed, Defendants' motion for summary judgment raised an Eleventh Amendment defense to the Plaintiffs' claims for damages but did not similarly raise a defense to the state law claims for injunctive and declaratory relief. Thus, if treated as an affirmative defense like any other, Plaintiffs argue that Defendants waived an Eleventh Amendment defense by failing to assert it and that the "law of the case" doctrine now precludes Defendants from "[t]reating new arguments as ground for a second decision." (Pls.' Opp. to Dismiss State Claims at 5.) The Supreme Court, however, has recognized that the Eleventh Amendment bar is "jurisdictional" in the sense that it can be raised at any point in a proceeding. *See Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998) ("[T]he Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings . . . ."); *Pennhurst*, 465 U.S. at 99 n.8 ("The limitation deprives federal courts of any jurisdiction to entertain such claims, and thus may be raised at any point in a proceeding."); *Townsend v. Edelman*, 518 F.2d 116, 121 (7th Cir. 1975)

("[A]n Eleventh Amendment argument is jurisdictional in the sense that it can be raised for the first time on appeal."). Although the Seventh Circuit has recently observed that the Eleventh Amendment bar is "non-jurisdictional," the court was noting the distinction between subject matter jurisdiction, which cannot be waived, and the "ability of [the federal] government to waive the benefit of sovereign immunity [via the Administrative Procedure Act]." *Blagojevich v. Gates*, 519 F.3d 370, 371 (7th Cir. 2008). This court does not read that decision to call into question the ability of a state to assert an Eleventh Amendment defense at any point in a proceeding.

Plaintiffs' state law claims under the College Campus Press Act are dismissed.

## II. Freedom of the College Campus Press at Illinois Public Colleges Under the First Amendment

As explained more fully in its previous opinion, the court applies strict constitutional scrutiny to any effort by the University to restrict student speech in *Tempo*'s pages. *See Moore v. Watson*, 738 F. Supp. 2d 817, 829-31 (N.D. Ill. 2010). In this type of free speech case, "[t]he level of scrutiny applicable to the government's actions . . . differs depending on the nature of forum from which the speaker has been excluded." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 865 (7th Cir. 2006). In a "designated public forum," as in a "traditional public forum," state restrictions on speech are subject to strict scrutiny; "[t]he government may 'exclude a speaker from a . . . public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" *Id.* (internal quotation marks omitted) (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). A government creates a "designated public forum" by "intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *see also Choose Life Ill., Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008).

When it passed the College Campus Press Act, 110 ILCS 13/1 *et seq*, which became effective January 1, 2008, the Illinois General Assembly designated student-run college

27

newspapers at public universities as public forums. The Act states explicitly that "[a]ll campus media produced primarily by students at a State-sponsored institution of higher learning is a public forum for expression by the student journalists and editors at the particular institution." 110 ILCS 13/10. The Act prohibits public university officials from subjecting campus media to prior review, regardless of whether the media outlet is "campus-sponsored or noncampus-sponsored." *Id.* Furthermore, the Act addresses the relationship between campus media and "collegiate media advisers," defined as persons "employed, appointed, or designated by the State-sponsored institution of higher learning to supervise or provide instruction relating to campus media." 110 ILCS 13/5. Specifically, the Act dictates that although a "collegiate media adviser" is free to "teach[] professional standards of grammar and journalism," the "[c]ollegiate student editors of campus media are responsible for determining the news, opinions, feature content, and advertising content of campus media." 110 ILCS 13/15. The Act protects a collegiate media adviser who refuses to suppress or censor the student publication, providing that such an adviser "must not be terminated, transferred, removed, otherwise disciplined, or retaliated against for refusing to suppress protected free expression rights of collegiate student journalists and of collegiate student editors." *Id.* Finally, the Act eliminates potential liability as a basis for censorship by effectively immunizing public universities from libel suits arising from campus media's content, declaring that such content "is neither an expression of campus policy nor speech attributable to a State-sponsored institution of higher learning." 110 ILCS 13/25.

By explicitly declaring a student-run newspaper at a public university to be a public forum and intentionally opening such a newspaper as space for public discourse, the Illinois legislature purposefully created a "designated public forum." Thus, "the state voluntarily ceded any ability it may have had to control the content of a student publication such as *Tempo*." *Moore*, 738 F. Supp. 2d at 831; *see also Hosty v. Carter*, 412 F.3d 731, 737 (7th Cir. 2005) (*en banc*) (recognizing that if a student newspaper at a public university "operated in a public forum, the University could not

28

vet its contents"); *cf. Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983) ("A public university may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper."); *Joyner v. Whiting*, 477 F.2d 456, 460 (4th Cir. 1973) ("It may well be that a college need not establish a campus newspaper, or, if a paper has been established, the college may permanently discontinue publication for reasons wholly unrelated to the First Amendment.  But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment.").  Accordingly, CSU and its officials are barred by the First Amendment from taking "adverse action against the student newspaper, including engaging in conduct designed to chill the speech contained in future editions, on the basis of the views expressed in the publication unless such action served a compelling government interest." *Husain v. Springer*, 494 F.3d 108, 125 (2d Cir. 2007).  The court proceeds to address Plaintiffs' claims that CSU did take action to chill exercise of First Amendment rights, by terminating Moore and by interfering with the publication of *Tempo*.

## III.    Moore's Termination

### A.    First Amendment Protections for Collegiate Media Advisers

Faculty advisors occupy a delicate position, expected to improve the quality of student publication but prohibited by the First Amendment from interfering with student editorial decisions. Moore was not a "speaker" within the traditional sense, because *Tempo*'s content did not contain any speech attributable to him.  Indeed, had Moore authored material critical of the University, the University could well be within its rights to fire him, especially because Moore, as Executive Director for Communications, was responsible for the University's public image.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the

Constitution does not insulate their communications from employer discipline."); *Spiegla v. Hull*, 481 F. 3d 961, 965 (7th Cir. 2007) ("*Garcetti* made clear that public employees speaking 'pursuant to their official duties' are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech.").[27]

The court nonetheless concludes that Moore can pursue a First Amendment retaliation claim for his termination because of the way the Illinois legislature constituted collegiate media outlets as limited public forums. Where "the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its actions are subject to strict scrutiny." *Forbes*, 523 U.S. at 677 . The Illinois legislature recognized collegiate media advisers employed by public universities as participants within the forum it established. The College Campus Press Act explicitly acknowledges faculty advisors' interest in the expressive freedom of the college students they advise by granting those advisers standing to sue for declaratory and injunctive relief to enforce the Act's prohibition against prior review by public university officials. 110 ILSC 13/20. Furthermore, the General Assembly recognized that a public university might attempt to retaliate against faculty advisors who refuse to suppress student speech. 110 ILSC 13/15. Because they are recognized participants within the designated public forum established by the Illinois General Assembly, the First Amendment protects collegiate media advisers against retaliation for the protected speech of the students. Notably, Defendants have never challenged Moore's standing in this case.

---

[27]    Defendants do not raise the *Garcetti* doctrine as a defense. Although Defendants might have argued that Arnold recommended Moore's termination because she believed he helped author the objectionable content in *Tempo*, Defendants claim just the opposite. Their sole defense is that unsatisfactory press releases caused Arnold's recommendation, which had nothing to do with *Tempo*.

### B.  Plaintiffs' Retaliation Claim

To establish a prima facie case of First Amendment retaliation under 42 U.S.C. §1983, Plaintiffs most prove "(1) that they were engaged in constitutionally protected speech; (2) that public officials took adverse actions against them; and (3) that the adverse actions were motivated at least in part as a response to the plaintiffs' protected speech." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008).  The parties do not dispute the first two elements of the test—that Plaintiffs engaged in constitutionally protected speech and that Moore's termination constitutes an adverse action—but they do dispute "whether Moore's termination was occasioned by his refusal to suppress student expression in *Tempo* or by his unsatisfactory job performance in unrelated tasks." *Moore*, 738 F. Supp. 2d at 831.  It is Plaintiffs' burden to show that the protected speech was a "motivating factor" in Pogue's decision to terminate Moore, in which case the burden shifts to Defendants to show by a preponderance of the evidence that they would have reached the same decision as to Moore's employment even in the absence of the protected conduct.  *See Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).  In other words, a plaintiff "must show only that the defendant's conduct was a sufficient condition of the plaintiff's injury" to make a prima facie case, whereas defendants "can rebut, but only by showing that [their] conduct was not a necessary condition of the harm—the harm would have occurred anyway." *Id.* at 980.  If, instead, the defendants do not carry their burden, "the inference is that 'but for' causation (that is, a necessary condition) has been shown: the plaintiff would not have been harmed had his rights not been violated by the defendant." *Id.* at 979.

As a preliminary matter, the evidence at trial satisfies the court that Interim President Pogue, who was the ultimate decision maker, terminated Moore "based on Arnold's recommendation without any independent review or investigation by Pogue." *Moore*, 738 F. Supp. 2d at 832 n.16.  Therefore, Pogue may be characterized as the "cat's paw" and Arnold the

proverbial monkey whose alleged improper motivation is attributable to the decisionmaker. *See, e.g.*, *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452-53 (7th Cir. 2009).[28]

The evidence—including Arnold's opinion of *Tempo*'s contents and the timing of Moore's termination—satisfies the court that Plaintiffs have made out a prima facie case of First Amendment retaliation. As this court previously pointed out,

> Both before and after Moore's ouster, Arnold expressed her displeasure with *Tempo*'s coverage—often in harsh terms. Nor were her complaints limited to matters of grammar or professionalism. Rather, the record reflects that Arnold protested about the newspaper's story choices and methods of reporting.

*Moore*, 738 F. Supp. 2d at 831. When Arnold expressed these negative views to Moore upon joining the advisory board, Moore explained that university administrators were not permitted to interfere with or suppress the speech published in *Tempo*. The evidence also suggests that Arnold blamed Moore for the objectionable content. Interim Vice President Beverly John's transition memo to Arnold, which Arnold received and discussed with John before recommending Moore's termination, blamed Moore for what John called the "negative tenor of the student newspaper." After Moore's termination, Arnold expressed her own opinion about the responsibility of *Tempo*'s adviser for the newspaper's content in an e-mail message to Providence, in which she asserted that the newspaper and its "interim adviser" were "wholly liable" for implying in print that Arnold had acted unethically.

---

[28]     As Justice Scalia recently explained,

The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 [(7th Cir. 1990)]. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward.

*Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1190 n.1 (2011).

Additionally, the timing of Moore's termination strongly supports the conclusion that Arnold recommended Moore's termination because of her objections to *Tempo*'s content. Although suspicious timing is not sufficient to establish a reasonable inference of retaliation, it is a factor that can be considered "in combination with other evidence." *Surita v. Hyde*, 665 F.3d 860, 878 n.4 (7th Cir. 2011); *see also Greene*, 660 F.3d at 980 (concluding that the timing of a "conduct report, together with the rather threadbare nature of the report, was sufficient . . . to create a triable issue.") Arnold's letter recommending termination is dated October 10, 2011, the day after Arnold was, in her own words, "outside [her] body with rage" upon reading an article in *Tempo*'s October 9 issue. Arnold also admits that it was on October 9 that she told Moore she found the article "unconscionable." According to Moore, he responded by defending Providence's right to publish the story.

Defendants claim that Arnold's sole reason for recommending Moore's termination was Moore's submission of two unsatisfactory press releases. The court, however, concludes that Defendants have not carried their burden of proving that Arnold would have recommended Moore's termination regardless of her objection to *Tempo*'s content and her interactions with Moore regarding *Tempo*. In reaching this conclusion, the court notes, first, that Arnold's explanation for her dissatisfaction with the press releases is unconvincing. Arnold complained that the press release lacked a title, release date, and hash marks denoting the end of the release. At closing arguments, the court likened her objections to situations in which a judge's law clerk fails to insert a case caption at the top of her first draft opinion—a failure of form rather than substance. Indeed, even at trial, Arnold herself did not criticize the substance of Moore's work. Second, Arnold's explanation for her recommendation to terminate Moore is suspect because of Arnold's apparent failure even to mention inadequacies in the press releases, let alone to offer instruction, direction, or feedback. The court does not believe that Arnold, who was outspoken at trial about her

intolerance for ineptitude among her subordinates, would have failed to mention the unsatisfactory work in her subsequent communications with Moore.

Instead, after she received the purportedly unacceptable press releases, Arnold communicated with Moore on a wholly unrelated matter—the October 9 issue of *Tempo*. The court concludes Plaintiffs have proven that Arnold's recommendation to terminate Moore was based, at least in part, on her objection to the protected speech in *Tempo*. Although Defendants have offered a reason for Moore's termination independent of protected speech—the unsatisfactory press releases—Defendants have not proven by a preponderance of the evidence that Arnold would have recommended Moore's termination on that ground regardless of her objection to *Tempo*'s protected speech. The court finds that Moore's termination was a violation of the First Amendment.

## C.     Equitable Remedies

At the close of trial, the court asked the parties to submit briefs addressing appropriate equitable remedies. Unfortunately, both parties used these briefs as an opportunity to reargue the issue of liability and, with limited exceptions, cited no law addressing the propriety of the remedies Plaintiffs proposed.

Among those equitable remedies Plaintiffs seek is "a declaration that the removal of Dr. Moore as faculty advisor to *Tempo* and firing him are violations of the First Amendment and an order directing defendants to reinstate him." (Pls.' Mem. on Appropriate Equitable Remedies at 5.) In the Title VII context, "reinstatement is the preferred remedy for victims of discrimination, and the court should award it when doing so is feasible." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001). Although "a court is not required to reinstate a successful plaintiff where the result would be a working relationship fraught with hostility and friction," *Id.*, the possibility of such friction in this case is minimal because the supervisors who terminated Moore—Arnold and Pogue—are

no longer employed by the University.  Reinstatement may be awarded less often in cases brought under 42 U.S.C. § 1983 because that statute affords greater monetary compensation.  *See Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 322 (1st. Cir. 1989).  In this case, however, where monetary damages are barred by the Eleventh Amendment, reinstatement appears to be the only remedy available to Moore.  The court therefore concludes that reinstatement is appropriate to remedy the First Amendment violation occasioned by Moore's termination.  *See Nanda v. Bd. of Trs.*, 303 F.3d 817, 831-32 (7th Cir. 2002) (affirming this court's decision that the plaintiff could maintain a § 1983 claim seeking reinstatement against public university officials named in their official capacity).

Plaintiffs also ask the court to order Defendants to remove from the University's employment records all negative evaluations of Moore related to his termination.  (Pls.' Mem. on Appropriate Equitable Remedies at 11-13.)  Substantial Seventh Circuit precedent supports this request.  *See, e.g.*, *Bruso*, 239 F.3d at 863-64.  Indeed, in *Bruso*, the Seventh Circuit held that a district court abused its discretion by denying a similar request by a plaintiff who won a jury verdict in favor on his retaliatory demotion claim.  *Id.*  The court finds expungement of negative material in Moore's employment record is an appropriate "means of removing the stain of the employer's discriminatory actions from the plaintiff's permanent work history."  *Id.* at 863.[29]

The court thus grants declaratory relief—a declaration that Moore's termination violated Plaintiffs' First Amendment rights—and orders Defendants to reinstate Moore to his previous

---

[29]     Plaintiffs also seek expungement of Defendants' records related to Providence. Specifically, Plaintiffs ask for an order directing expungement of "Lansana's complaint to university administrators about [Providence's] alleged insubordination by refusing to submit articles for review prior to publication . . . ." (Pls.' Mem. on Appropriate Equitable Remedies at 12.)  Plaintiffs have not proven that Lansana's e-mail message would become part of any record associated with Providence in the way that negative evaluations addressing Moore's termination would be part of Moore's employment record, and might be relayed to Moore's prospective employers.  In the absence of evidence that Lansana's e-mail would be appended to Providence's academic transcript, the court denies Plaintiffs' requested remedy with regard to Providence.

position as Executive Director for Communications, or to a similar position. Because Moore's termination effectively prevented the renewal of his one year employment contract, the court orders that Moore be reinstated for an employment term of not less than one year.[30] The court also orders that Defendants remove all negative material in the University's employment records concerning Moore's termination. As *Tempo* appears to have once again become dormant and, as explained below, Plaintiff has not proven that the University caused *Tempo*'s current lapse, the court declines to reinstate Moore to his position as *Tempo*'s faculty advisor. Indeed, even if *Tempo* were still operational, it would arguably be inappropriate for Moore to serve both as Executive Director of Communications and as *Tempo*'s faculty adviser, in light of the potential conflict of interests.

## IV. Subsequent University Conduct Toward Providence and *Tempo*

The court recognizes that violations of Providence's First Amendment rights did not end with Moore's termination. For example, Lansana insisted upon vetting the paper's contents and directed that the publication of an issue be delayed. Also, Arnold zeroed in on *Tempo* for the enforcement of a "protocol" requiring *Tempo* reporters to contact Arnold before interviewing University employees. The court nonetheless concludes that it cannot grant Providence any of the relief he requests against the Defendants named in this lawsuit.

Plaintiff Providence seeks declaratory and injunctive relief for Lansana's and Arnold's attempts to impose prior review upon Providence and *Tempo*; for Lansana's withholding publication

---

[30]     Defendants did not address Moore's request for reinstatement in Defendants' memorandum on equitable remedies, much less whether reinstatement is appropriate for an employee whose one-year employment contract has expired. At any rate, the court is satisfied that Moore's contract would have been renewed absent the constitutional violations. At trial, Plaintiffs presented Edwards's testimony concerning the repeated renewal of his employment contract, suggesting that the renewal of employment contracts was routine at CSU. (*Id.* at 350-51.) Defendants presented no evidence to the contrary. Moreover, Pogue's letter to Moore specifically referenced contract renewal, notifying Moore that although he would be paid for the rest of his contract term, his contract would not be renewed. As such, the same constitutionally impermissible reasons attributable to Pogue's decision to terminate Moore are attributed to his decision not to renew Moore's employment contract.

of the October 19, 2009, *Tempo* issue;[31] and for Arnold's "protocol" that *Tempo* staff receive clearance from the University's public relations department before interviewing University employees. Neither Arnold nor Lansana are Defendants in this case, however. Instead, the named Defendants are successor officials who were properly substituted as Defendants pursuant to Federal Rule of Civil Procedure 25.[32] Although Plaintiffs' claims did not abate simply because of the transition in the administration, the commentary to Rule 25 notes that a successor defendant "who does not intend to pursue the policy of his predecessor which gave rise to the lawsuit" may "seek to have the action dismissed as moot or to take other appropriate steps to avert a judgment or decree." FED. R. CIV. P. 25(d) advisory committee's note to 1961 Amendment.

Until their closing arguments, Defendants' arguments concerning mootness addressed Providence's resignation as editor of *Tempo* and his absence from CSU beginning in the fall semester of 2009 (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. at 5-8), not the change in officials. At closing arguments, however, Defendants did make the argument that neither Pogue nor Arnold are presently employed by CSU and that even if they did violate Providence's rights, Plaintiffs have not shown that the "injury is ongoing or likely to recur." (Trial Tr. at 466.) Despite Defendants' tardiness in raising this argument, the court has taken it into consideration because mootness is a jurisdictional issue. *See Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) ("Mootness is a threshold jurisdictional question that insures that the court is faithful to the case or controversy limitation in Article III of the Constitution.")

The Seventh Circuit has explained the need for caution in circumstances such as these:

---

[31] Notably, Plaintiffs did not seek a temporary restraining order against Lansana's policies and his decision to delay publication.

[32] Rule 25(d) provides, in pertinent part: "An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must by disregarded." FED. R. CIV. P. 25(d)

> A demand for present or prospective (declaratory or injunctive) relief imposes a substantial burden on the plaintiff to show survival of the controversy. Thus, when a public official is sued in his official capacity and the official is replaced or succeeded in office during the pendency of the litigation, the burden is on the complainant to establish the need for declaratory or injunctive relief by demonstrating that the successor in office will continue the relevant policies of his predecessors.

*Kincaid v. Rusk*, 670 F.2d 737, 741 (7th Cir. 1982) (citing *Spomer v. Littleton*, 414 U.S. 514, 520-23 (1974)), *abrogated on other grounds by Salazar v. City of Chicago*, 940 F.2d 233 (7th Cir. 1991).

Although Plaintiffs have produced evidence that Lansana and Arnold violated Providence's First Amendment rights, they have produced no evidence that Defendants have continued or will continue Lansana's and Arnold's policies or practices. From all that appears in the record, Lansana's policy of prior review, his decision to delay the publication of one issue of *Tempo*, and Arnold's "protocol" were idiosyncratic practices of those officials. Because Plaintiffs have not met their burden, declaratory and injunctive relief against Defendants for these practices is improper.

Nor is the court satisfied that Plaintiffs are entitled to the other equitable relief they request. Plaintiffs seek an order reinstating *Tempo*, which has not been published since Providence's departure. But Plaintiffs have not shown that *Tempo*'s dormancy is a result of any action by University officials. Plaintiffs emphasize the fact that the University denied Providence access to *Tempo*'s office by refusing to give him a key, but it was not University practice for students to receive keys to the student organization offices, and Providence was evidently able to produce the paper before Lansana allowed him to borrow a key. Providence offered no evidence that the University barred him from the newspaper's office during hours when the student activities office was open and unlocked. The court finds it more likely that lack of student interest after Providence's voluntary departure was the reason for *Tempo*'s lapse; several of *Tempo*'s final issues contained little or no original content beyond that authored by Providence.

Plaintiffs also ask this court for a declaration that the elimination of Timothy Edwards's position as *Tempo*'s business manager violated the First Amendment and an order reinstating that

position. Plaintiffs' request is awkward because Timothy Edwards is not a plaintiff in this action. Although the court finds the elimination of the business manager position suspect, Plaintiff did not produce adequate evidence at trial to prove that Edwards's termination was motivated by *Tempo*'s editorial content. Indeed, the court is not even aware who was responsible for the decision to eliminate the business manager position. Even if the court were to entertain an injunction ordering the University to hire a new business manager, the issue is now moot because *Tempo* is no longer operational.

Finally, Plaintiffs ask for a declaration that Providence "was forced to resign as editor of *Tempo* and to withdraw from Chicago State University as a result of harassment and censure of *Tempo*, and an order directing Defendants to readmit him to the University and reinstate him as editor of *Tempo*." (Pls.' Mem. on Appropriate Equitable Remedies at 13-15.) The evidence does not establish, however, that University officials drove Providence from *Tempo* or the University. Providence himself announced he was resigning as *Tempo*'s editor in order to focus on his grades. Although Providence's numerous conflicts with university officials during his tenure as editor undoubtably added to the burden of that position, Providence voluntarily departed from *Tempo*. Moreover, the only impediment to Providence's return to CSU, should he choose to do so, is his outstanding tuition debt, which has nothing to do with this litigation.

## CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss claims pursuant to the Illinois College Campus Press Act [86] is denied. The court declares that Moore's termination was a violation of Plaintiffs' First Amendment rights. The court orders Defendants to reinstate Moore to his previous or similar position. The court further orders Defendants to expunge all negative materials regarding Moore's termination in his employment records. All other equitable relief

requested by Plaintiffs is denied.  The judgment is final and appealable, but the court will retain

jurisdiction to enforce the relief ordered here.

ENTER:

Dated:  March 13, 2012

_____
REBECCA R. PALLMEYER
United States District Judge